UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

Karen Evanson,                                    Civ. No. 12-1195 (JRT/LIB)

              Plaintiff,

v.                                                **REPORT AND RECOMMENDATION**

Safe Haven Shelter,

              Defendant,

This matter came before the undersigned United States Magistrate Judge upon Defendant
Safe Haven Shelter's motion for summary judgment.  The motion was referred to the
undersigned Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. §
636(b)(1) and Local Rule 72.1.  The Court held a hearing on the motion on July 2, 2013.  For the
reasons outlined below, the Court recommends that Defendant's motion for summary judgment
be **GRANTED**.

Karen Evanson (Plaintiff) filed this employment discrimination, harassment, and
retaliation action against Safe Haven Shelter (Defendant) on May 17, 2012.  (See Compl.
[Docket No. 1]).  In her Complaint, Plaintiff asserts the following claims: 1) violations of the
Americans with Disabilities Act of 1990 (ADA); 2) violations of the Minnesota Human Rights
Act (MHRA); and 3) violations of the Genetic Information Nondiscrimination Act of 2008
(GINA).  (Compl. ¶¶ 9-43).[1]

Plaintiff asserts that Defendant violated the ADA and MHRA on three basis: 1)
"Defendant has refused to accommodate Plaintiff's disabling condition on several occasions

---

[1] At the hearing on Defendant's motion, Plaintiff stated that she wished to voluntarily dismiss her GINA claim,
without any objection from Defendant.  Therefore, pursuant to the stipulation of the parties, the Court recommends
that Plaintiff's claim relating to GINA be dismissed with prejudice.

without good cause"; 2) Defendant retaliated against Plaintiff because of her disabilities; and 3) Defendant "created and perpetuated a hostile work environment for Plaintiff as a direct result of Plaintiff's need and request for accommodations for her disabilities." (Id. ¶¶ 17-19, 29-31).

## I.    FACTUAL BACKGROUND

The facts discussed below relevant to Plaintiff's claims are primarily not in dispute unless specifically identified otherwise.

### A.  Plaintiff's Employment Relationship with Defendant

Defendant is "a non-profit organization that provides a safe environment for battered women and children when it is unsafe for them to remain in their homes." (Aff. of Susan Utech [Docket No. 15] ¶ 2). In addition to providing physical shelter, Defendant "assists its 'residents' in domestic violence-related court proceedings, finding housing, finding employment, and acquiring services available to them from public and private agencies." (Id.)

Although Plaintiff began working for Defendant on May 3, 2007, it was not until November 1, 2008 that she became a full-time employee. (Id. ¶ 3). She remained a full-time employee until January 15, 2013, when she voluntarily resigned. (Id.); (Docket No. 16 at 1).[2]

The responsibilities for the position in which Plaintiff was employed included: "handling incoming crisis calls from domestic violence victims, assisting women and children in crisis situations, completing the intake process with new residents, establishing safety plans for residents, assisting residents in obtaining needed services from public/private agencies, and assisting residents with long-term goals for employment and housing." (Id. ¶ 4). The position further included responsibilities for "distributing living supplies, providing transportation, and otherwise attending to the day-to-day needs of shelter residents." (Id.) "Maintaining accurate

---

[2] While Plaintiff acknowledges that she voluntarily resigned, she alleges that she left "because of the extremely hostile work environment and the impact it was having on her health." (Pl.'s Mem. of Law in Opp'n [Docket No. 22] at 1); (Decl. of Karen S. Evanson [Docket No. 23] ¶ 2).

records of services rendered at the shelter, recipients of those services, the effectiveness of those services, and important events/activities involving residents (i.e. crisis calls, shelter intakes, and departures) is critical to Safe Haven's operations." (Id. ¶ 5). Thus, the ability to maintain accurate records was critical to the function of Plaintiff's position with Defendant. (Id.)

In November of 2007, Plaintiff experienced a stroke, and Defendant permitted her to take leave until January 2, 2008. (Id. ¶ 6). In December of 2008, Defendant began to implement a new software program ("Alice") to "accurately and efficiently track important information," which required employees to enter the information into the software database. (Id. ¶ 7). "Alice" permitted employees to enter intake information from clients into a database, which could later be reviewed by other employees "to get up to speed with the status of residents at the shelter …." (Id.) Employee training on "Alice" continued into 2009. (Id. ¶ 8).

Defendant asserts that during the training, it noticed that Plaintiff was experiencing difficulties with the software and "worked with her to develop an accommodation so that she could perform the data entry function of her position." (Id.) At some time in the Spring of 2009, Defendant "began accommodating Plaintiff's difficulties with [the software] by allowing her to record [information] . . . on handwritten forms instead of entering the information into Alice." (Id. ¶ 9). The handwritten forms completed by Plaintiff would then be entered into "Alice" by other employees. (Id.) Plaintiff continued to utilize this accommodation until her resignation in 2013. (Id.) Plaintiff acknowledges this accommodation by Defendant, but she maintains that it was made on the basis of a request from her and that the accommodation irritated other employees who would then be required to enter the information into "Alice." (See Docket No. 23 at 16, 41)

In June of 2009, Defendant received a letter from Plaintiff's treating physician explaining that as a "direct result of a medical event she suffered in 2007[,which was] not reversible," Plaintiff had "significant difficulties with short-term memory formation and retrieval, which ma[d]e it difficult and at times impossible for [Plaintiff] to successfully learn new tasks or processes." (Id. ¶ 10); (Docket No. 16 at 7). Plaintiff states that she provided the note to Defendant because Defendant's "representatives had asked for more information about [her] work abilities." (Decl. of Karen S. Evanson ¶ 5).

Ms. Utech provides that Plaintiff "never 'asked' for an accommodation with respect to her memory/learning issues." (Aff. of Susan Utech ¶ 11). Rather, Ms. Utech asserts that Defendant recognized the need for an accommodation and worked with Plaintiff to allow her to perform the essential functions of her position such that she could continue working. (Id.) Furthermore, according to Ms. Utech, well into 2011, Plaintiff refused Defendant's multiple requests to discuss whether the accommodation provided to Plaintiff was continuing to work effectively. (Id.) As evidence, Defendant provides meeting notes from an August 1, 2011, meeting between Plaintiff and Defendant's supervisors, which state that during the meeting Plaintiff's supervisors continually and unsuccessfully attempted to discuss with her ways to improve her deficiencies. (Id.); (Docket No. 16 at 8). Plaintiff admits that during the meeting her supervisors attempted to ask her about her medical condition and what made it difficult for her to input information into "Alice," but Plaintiff "felt bad and started to cry and [] left." (Karen Evanson Dep. 103:23 – 104:3, May 17, 2013 [Docket No. 28, Ex. 2]).

On September 16, 2009, Plaintiff provided a memorandum to Bonnie Kolodge, her former supervisor, explaining that she had difficulties remembering things and that she had a stroke, which was impacting her ability to perform her work. (Decl. of Karen S. Evanson ¶ 6);

(Docket No. 23 at 16).  The memorandum was entitled "Help!" and concluded with: "What can I do? Help!!"  (Docket No. 23 at 16).

In February of 2010, Defendant received a letter from Plaintiff's treating physician indicating that Plaintiff suffered from "fatigue which is markedly worse in the evening hours," and stating it would be "preferable for her to continue to work early daytime hours in order to maintain her physical energy and productivity."  (Aff. of Susan Utech ¶ 12); (Docket No. 16 at 9).  In response, Defendant altered Plaintiff's work schedule such that she was primarily working day time shifts from early morning to early afternoon, and Plaintiff was required to work past 4:00 p.m. only on a handful of occasions for the almost three years following the note from her physician.  (Aff. of Susan Utech ¶ 13); (Docket No. 17 at 1-37 and Docket No. 18 at 1-38) (providing all of Plaintiff's time sheets).  Plaintiff states that she provided this note to Defendant because "Janet Olson had asked [her] to work night hours which was difficult for [her]."  (Decl. of Karen S. Evanson ¶ 7).[3]

Ms. Utech attests that Plaintiff continued to handwrite the intake information and maintain the adjusted shift schedule, allowing her to perform the essential functions of her position, and that Plaintiff "never indicated that they were inadequate or requested alternative accommodations."  (Aff. of Susan Utech ¶ 14).  Furthermore, Ms. Utech provides that Defendant "never disciplined [Plaintiff], reduced her wages, reduced her hours, changed her job status or title, or took any other adverse employment action against [Plaintiff] for failure to record data on the paper forms or only being available for day shifts."  (Id.)

On June 14, 2011, Plaintiff received an email from Dawn King, one of Plaintiff's former supervisors, stating that Plaintiff had failed to adequately record notes from an intake call, which

---

[3] In September 2010, Plaintiff again provided the Defendant with the same physician note as in February 2010. (Decl. of Karen S. Evanson [Docket No. 23] at 18).

did not allow the employee to enter the information into the software database.  (Docket No. 23 at 27).  The letter concluded by stating that if Plaintiff had "any further questions" or if she felt "that [she] need[ed] to be accommodated in some other way," to let Ms. King know.  (Id.)

On September 20, 2011, Plaintiff provided a note to Defendant from her treating physician, again explaining that Plaintiff was under her care, and requesting that "[a]ccommodations should be made so that [Plaintiff] does not do data entry on the computer." (Docket No. 23 at 36).

On June 20, 2012, Plaintiff sent an email to Defendant explaining that she had difficulty completing certain activities, such as those dealing with the software database, "using the fax machine, using the copy machine and looking up just about anything on the computer."  (Docket No. 23 at 41).  She explained that when she sought help from co-workers, they would tell her she was "irritating them."  (Id.)  Thus, she asked whether her supervisor could "give [her] some advice on how to handle this and maintain good co-worker relations."  (Id.)

On January 7, 2013, Plaintiff's direct supervisor, Brittany Robb, sent an email to Susan Utech summarizing a meeting Ms. Robb had with Plaintiff on January 7, 2013.  (See Docket No. 23 at 39).  Plaintiff provides that she never saw this email until she received a complete copy of her personnel file.  (Decl. of Karen S. Evanson ¶ 26).  Plaintiff does not dispute that the meeting occurred, but she disputes some of the statements made by Ms. Robb in the email.  (Id.)  However, Plaintiff does not dispute Ms. Robb's statements that during the meeting Ms. Robb "encouraged [Plaintiff] to talk with [her] if [Plaintiff] was feeling overwhelmed during [the] shifts."  (Docket No. 23 at 39).

In January of 2013, prior to Plaintiff's resignation, Plaintiff's received a performance evaluation without being asked to complete a self-evaluation.  (Decl. of Karen S. Evanson ¶ 32);

(Docket No. 23 at 43-48). Although the evaluation included some positive comments regarding Plaintiff's genuine kindness and caring, it also provided that Plaintiff needed improvement in most areas—criticism Plaintiff disagrees with. (Id.) The evaluation is more unfavorable than two prior reviews Plaintiff received when she was a part-time employee for Defendant in 2007 and 2008. (Docket No. 23 at 6-14). The evaluation is not signed by any employee, and it is not entirely clear by whom it was completed.

On January 11, 2013, Plaintiff had a meeting with an unidentified employee of Defendant. (Docket No. 23 at 49-50). The unidentified supervisor completed meeting notes, which Plaintiff did not receive a copy of until she received a complete copy of her personnel file. (Decl. of Karen S. Evanson ¶ 33). The meeting notes provide, and Plaintiff does not dispute, that during the meeting the unidentified supervisor offered to help Plaintiff develop improvement in the areas that needed to be addressed and offered to work with Plaintiff to accommodate her in whatever way she believed would be required; however, Plaintiff never indicated ways in which she believed she could be accommodated. (Docket No. 23 at 49-50).

**B. Disciplinary Actions Taken Against Plaintiff**

While employed at Defendant, Plaintiff was represented by the American Federation of State County and Municipal Employees Union, Council 5, AFL-CIO, and a collective bargaining agreement (CBA) controlled the terms and conditions of her employment. (Aff. of Susan Utech ¶ 15); (Docket No. 19 at 1-33). The Discipline and Discharge section of the CBA provides that after a probationary period an employee may be disciplined via oral reprimand, written reprimand, suspension, demotion, or discharge, but only for "just cause." (Docket No. 19 at 25).

> The appropriate level of discipline [is] determined by the Employer based on the facts of each case. The employer [is to] abide by principles of progressive discipline although: 1) it is not bound to use all of the above-identified

disciplinary forms, and 2) it retains the right to terminate an employee without prior warning for egregious conduct.

(Id.)

During her employment with Defendant, Plaintiff was disciplined on three occasions. The first incident leading to discipline occurred on April 8, 2011, when Plaintiff left work for a medical appointment at 9:15 a.m., indicating that she would return to work after the appointment, but in fact, she did not return to work and never informed a supervisor that she would not be returning.  (Aff. of Susan Utech ¶ 16); (Docket No. 19 at 34).  Plaintiff later explained to Defendant that there was a purported miscommunication between Plaintiff and her daughter as to who would let Defendant know that she would not be returning to work.  (See Docket No. 23 at 24).  Although Defendant initially issued a written warning to Plaintiff for failing to advise Defendant that she would not be returning to work that day, conduct that "violated well-established workplace rules and practices," the written warning was later reduced to a verbal warning.  (Aff. of Susan Utech ¶ 16).

The second disciplinary action arises out of an incident on May 8, 2011, when Plaintiff told Defendant that she had a medical appointment, and again without giving notice to management, did not return to work the following day.  (Id.)  When asked why she failed to advise any supervisor that she would not be returning to work, Plaintiff explained that "she believed the clinic sent a facsimile to [Defendant] indicating that she could not return to work for thirty (30) days."  (Id.)  Ms. Utech stated that Defendant never received any such facsimile, and as such, it issued Plaintiff a "written warning for failing to contact management when requesting leave, conduct that violated well-established workplace rules and practices and provisions in the CBA requiring employees to inform a supervisor before taking extended sick leave."  (Id.)

In her affidavit, Plaintiff includes a copy of a letter from her treating physician, dated May 9, 2011, which states that Plaintiff was receiving medical care and "should be allowed to return to work on 6/9/11." (Docket No. 23 at 21). A June 13, 2011, memorandum from Defendant (discussing all three of the discipline incidents and the basis for them) provides that during May 8 and May 9, Defendant's fax machine was not working and was likely the reason Defendant did not receive the letter. (Docket No. 23 at 24). It further provides that Plaintiff's daughter, on May 9, brought a copy of the letter to Defendant. (Id.) However, because Plaintiff had been previously instructed specifically to "call a supervisor when [she would] not be able to complete a scheduled shift," Plaintiff's supervisor concluded that Plaintiff should have directly contacted a supervisor rather than relying on a fax from her doctor and imposed the written warning. (Id.)

The final discipline against Plaintiff was imposed because of a series of incidents beginning in May of 2011, when Defendant "sought to obtain competitive quotes from group health plan providers pursuant to its obligation under the CBA to provide health insurance to bargaining unit employees," and asked employees to "complete a questionnaire on a secure, online database accessible only by group health plan providers interested in submitting premium quotes." (Aff. of Susan Utech ¶ 16). Defendant's insurance agent met with Defendant's employees (including Plaintiff) and informed them that "the information submitted would not be accessible by Safe Haven management." (Id.)[4] However, Plaintiff and two other employees "refused to complete the questionnaire, and, as a result, [Defendant] was unable to get competitive quotes for the group health plan." (Id.) Before imposing any discipline against

---

[4] Defendant never directly "requested personal or family health information from its employees, engaged in conduct with the intent to obtain personal or family health information from employees, obtained any personal or family health information of its employees, or gained access to information submitted by employees into the secure database." (Aff. of Susan Utech ¶16.)

Plaintiff, Defendant had sent Plaintiff a letter on May 27, 2011, again advising her that the information she submitted would be entirely confidential and would not be shared with Defendant and warned her that "[f]ailure to comply with [the] request [would] result in discipline." (Docket No. 23 at 22). On June 3, 2011, Defendant sent Plaintiff another letter informing her that there would be a discipline investigation, but because Plaintiff was on leave and had "asked that all discipline investigations and matters be delayed until [she] return[ed] to work on June 9th, [Defendant would] honor that request for this matter as well." (Id. at 23). Ultimately, a one-day suspension was imposed because Plaintiff "limited Safe Haven's options for providing health insurance." (Docket No. 23 at 25-26).[5]

In addition to the disciplinary actions above, Plaintiff was given a reprimand, but it ultimately did not result in any discipline being imposed. On December 29, 2011, Ms. Utech sent Plaintiff a letter stating that a two-day suspension would be imposed because Plaintiff "deviated from the agency Standard of Conduct," specifically by failing to respond to a client's needs, not being an active team participant and that she "vilified and intimidated other employees." (Docket No. 23 at 38). On January 9, 2012, however, Ms. Utech sent an email advising that she had decided to dismiss the two-day suspension. (Id. at 40).[6]

## II. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

Summary Judgment is appropriate when the evidence demonstrates that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(a); Smutka v. City of Hutchinson, 451 F.3d 522, 526 (8th Cir. 2006).

---

[5] One of Plaintiff's supervisors, who communicated the one-day suspension to Plaintiff, also sent a follow-up apology email for the short notice regarding which day the suspension would be imposed on and changed the suspension day to the following day. (See Docket No. 23 at 28).
[6] Plaintiff filed grievances with her union representative regarding two of the above disciplines, but there is nothing further in the record regarding the grievances. (See Docket No. 23 at 29-30).

A disputed fact is "material" if it might affect the outcome of the case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the burden of bringing forward sufficient admissible evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The evidence must be viewed in the light most favorable to the nonmoving party, and the nonmoving party must be given the benefit of all reasonable inferences to be drawn from the underlying facts in the record. Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp., 950 F.2d 566, 569 (8th Cir. 1991). However, the nonmoving party may not rest on mere allegations or denials in its pleadings, but must set forth specific admissible evidence-based facts showing the existence of a genuine issue. Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002). The movant is entitled to summary judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

**B. Discussion**

Defendant seeks summary judgment on all of Plaintiff's claims. Defendant argues that Plaintiff's failure to accommodate and hostile work environment claims under the ADA and MHRA fail because Plaintiff failed to exhaust her administrative remedies and because both these claims are barred by the applicable limitations period. (Mem. of Law in Supp. [Docket No.

14] at 1).  Even if the claims don't fail on either of these grounds, however, Defendant also argues that Plaintiff's claims fail under the <u>McDonnell-Douglas</u> burden shifting analysis.  (<u>Id.</u>)

Plaintiff disputes Defendant's arguments, and she further initially argues that Defendant's motion for summary judgment is premature.  (<u>See</u> Pl.'s Mem. of Law in Opp'n at 8).  The Court discusses this latter issue first.

### 1)  Defendant's motion is not premature

Plaintiff's prematurity argument is brief and without citation or supporting facts:

> The scheduling order in this case allows discovery through July 2, 2013.  The dispositive motion deadline is September 2, 2013.  Plaintiff has served discovery requests on Defendant and noted the deposition of Defendant's primary decision-maker, Susan Utech, but responses have not yet been received.  Defendant made this motion too early.  Dismissing this case would be premature.

(<u>See</u> Pl.'s Mem. of Law in Opp'n at 8).

Under Fed. R. Civ. P. 56(b), "[u]nless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery."  However,

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> **(1)** defer considering the motion or deny it;
> **(2)** allow time to obtain affidavits or declarations or to take discovery; or
> **(3)** issue any other appropriate order.

Fed. R. Civ. P. 56(d).[7]  "In analyzing whether a claim is ripe for summary judgment, a district court has discretion to determine whether the parties have had adequate time for discovery, and that determination is reviewed for abuse of discretion."  <u>Stanback v. Best Diversified Prods., Inc.</u>, 180 F.3d 903, 910 (8th Cir. 1999).  "Although discovery does not have to be completed

---

[7] Prior to December 1, 2010, when the Federal Rules of Civil Procedure were amended, the current 56(d) rule was numbered 56(f).  <u>Hamilton v. Bangs, McCullen, Butler, Foye & Simmons, L.L.P.</u>, 687 F.3d 1045, 1049 n.3 (8th Cir. 2012).

before a court can grant summary judgment, summary judgment is proper only after the nonmovant has had adequate time to engage in discovery." Id. at 911.

"A party invoking [the] protections [of Rule 56(d)] must do so in good faith by affirmatively demonstrating why [s]he cannot respond to a movant's affidavits as otherwise required by Rule 56(e) and how postponement of a ruling on the motion will enable [her], by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact." United States v. Light, 766 F.2d 394, 397-98 (8th Cir. 1985) (quoting Willmar Poultry Co. v. Morton-Norwich Prods., 520 F.2d 289, 297 (8th Cir. 1975)).

Defendant argues that its motion is timely and that Plaintiff cannot make the required showing to postpone ruling on the summary judgment motion because "[d]iscovery opened on September 13, 2012," providing more than 6 months for Plaintiff to perform discovery. (Def.'s Reply Mem. [Docket No. 25] at 12). Furthermore, Defendant provides that the interrogatories and request for documents mentioned by Plaintiff were served on April 17, 2013—twelve days after the motion for summary judgment was filed. (Id.) The Susan Utech deposition upon which Plaintiff relies was also not noticed until April 17, 2013. (Id.)[8] In other words, after letting all but the remaining approximate 10 weeks of the discovery period established by the Pretrial Scheduling Order pass, Plaintiff appears to not have ever begun pursuing the discovery described in her timeliness argument until after she received notice that the summary judgment motion was filed.

The Court finds that Plaintiff has failed to demonstrate the specific discovery which she believes would "enable [her] to discover additional evidence which might rebut the movant's showing of the absence of a genuine issue of material fact." See Robinson v. Terex Corp., 439

---

[8] The deposition took place on May 17, 2013, and Plaintiff has now filed a copy of the entire deposition into the record. (See Docket No. 28, Ex. 1).

F.3d 465, 467 (8th Cir. 2006). Furthermore, on June 27, 2013, Plaintiff submitted an affidavit with copies of the deposition transcripts of Plaintiff and Susan Utech, (see Decl. of Kathleen A. Norton [Docket No. 28]), and, at the hearing, the Court permitted Plaintiff to file a supplemental letter brief setting forth her arguments as to the factual basis in either of those depositions which she believed defeated Defendant's motion for summary judgment.[9] Therefore, there is no basis to find, nor has Plaintiff presented any argument, that additional time would permit Plaintiff to obtain additional discovery that would be relevant to the pending dispositive motion. As such, the Court finds that Defendant's motion is not premature.

### 2) Plaintiff's ADA and MHRA Claims

As previously noted, Plaintiff asserts that the ADA and MHRA were violated in three ways: 1) "Defendant has refused to accommodate Plaintiff's disabling condition on several occasions without good cause"; 2) Defendant retaliated against Plaintiff because of her disabilities; and 3) Defendant "created and perpetuated a hostile work environment for Plaintiff as a direct result of Plaintiff's need and request for accommodations for her disabilities." (Compl. ¶¶ 17-19, 29-31).

The Court next considers Defendant's arguments that Plaintiff's failure to accommodate and hostile work environment claims under the ADA and MHRA fail because Plaintiff did not exhaust her administrative remedies and because both of these claims are barred by the applicable limitations period. (Mem. of Law in Supp. [Docket No. 14] at 1). Defendant

---

[9] The Court permitted "Plaintiff to file a supplemental three-page letter brief, with the limited scope described at the hearing, by July 9, 2013." (Minute Entry [Docket No. 29]). Plaintiff filed her supplemental letter brief on July 10, 2013—one day late. (See Letter to Magistrate Judge [Docket No. 30]). In its response, Defendant points out that Plaintiff's letter brief was untimely and requests that the Court strike it. (See Letter to Magistrate Judge [Docket No. 31] at 1). While the Court is by no means required to accept this untimely submission, the Court will accept it and consider it as part of the record.

alternatively argues that if the claims are not dismissed on these grounds, they still fail under the McDonnell-Douglas burden shifting analysis. (Id.) The Court considers each argument in turn.

### a. Plaintiff exhausted her failure to accommodate and hostile work environment claims

"Before filing a lawsuit under the ADA, a plaintiff must exhaust his or her administrative remedies by filing a charge with the EEOC." Marz v. Presbyterian Homes and Servs., No. 11-cv-0200 (JNE/SER), 2011 WL 2912866, at *7 (D. Minn. Jun. 22, 2011) (finding that the plaintiff's EEOC charge failed to provide sufficient notice to the defendant and, as a result, the plaintiff's failure to accommodate claim was not exhausted). "To satisfy the exhaustion requirement, the administrative charge must provide the employer sufficient notice of the plaintiff's claim." Id.

"Allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumscribe the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge." Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 223 (8th Cir. 1994) (quoting Babrocky v. Jewel Food Co. & Retail Meatcutters, 773 F.2d 857, 863 (7th Cir. 1985)) (finding that Plaintiff's claim for race discrimination was properly dismissed because her "EEOC charge [did] not even hint of a claim of race discrimination.").

"To determine whether an allegedly discriminatory action falls within the scope of a claim, the administrative complaint must be construed liberally in order to further the remedial purposes of applicable legislation." Dorsey v. Pinnacle Automation Co., 278 F.3d 830, 838 (8th Cir. 2002). "Accordingly, the sweep of any subsequent judicial complaint may be as broad as the scope of the EEOC 'investigation which could reasonably be expected to grow out of the

charge of discrimination.'" Cobb v. Stringer, 850 F.2d 356, 359 (8th Cir. 1988) (quoting Griffin v. Carlin, 755 F.2d 1516, 1522 (11th Cir. 1985)). As such, "[t]he proper exhaustion of administrative remedies gives the plaintiff a green light to bring her employment-discrimination claim, along with allegations that are 'like or reasonably related' to that claim, in federal court." Shannon v. Ford Motor Co., 72 F.3d 678, 684 (8th Cir. 1996). "[C]ourts should not use Title VII's administrative procedures as a trap for [the] unwary." Id. at 685. "[M]ere vagueness in a *pro se* claim should not sound the death knell for the plaintiff's discrimination allegation." Id. (quoting Pickney v. American Dist. Telegraph Co. of Ark., 568 F. Supp. 687, 690 (E.D. Ark. 1983)). "But there is a difference between liberally reading a claim which 'lacks specificity,' *ibid.,* and inventing, *ex nihilo,* a claim which simply was not made." Id.

Here, Plaintiff's Notice of Charge of Discrimination (Notice) includes a checkmark in the ADA and ADEA boxes for which Act the discrimination was based on. (See Docket No. 19 at 35). Under the "circumstances of alleged discrimination" section, Plaintiff checked the age, disability and retaliation boxes. (See Id.) In the section for what the discrimination was based on, Plaintiff checked the age, disability, and retaliation boxes. (See Id. at 36). The alleged dates between which the discrimination took place were November 1, 2007 and June 16, 2011. (Id.) In the particulars section, Plaintiff described the following:

> I am employed with the above named Respondent. The Respondent is aware of my disabilities and record disabilities. I am subjected and expected to work outside of my restrictions. I am one of the few significantly older employees. I am subjected to discipline different from others outside of my protected statuses. My employment has been threatened by the Respondent.

> Respondent's reason for adverse action: None given.

> I believe I have been discriminated against on the basis of my age/65, disabilities and record of disabilities, and/or in retaliation for requesting reasonable accommodations. These are in violation of the Age Discrimination in

Employment Act of 1967, and Titles I and V of the Americans with Disabilities
Act of 1990, each as amended.

I believe other employees within my protected statuses have been discriminated
against on the basis of their age, disabilities, and/or requests for reasonable
accommodations, in violation of the Age Discrimination in Employment Act of
1967, and Titles I and V of the Americans with Disabilities Act of 1990, each as
amended.

(Id.) [10]

While Defendant argues that Plaintiff's failure to accommodate claim is not within the

scope of the EEOC charge, at least two sentences in the Notice demonstrate that it is: 1) "I am

subjected and expected to work outside of my restrictions"; and 2) "I believe I have been

discriminated against on the basis of my …disabilities and record of disabilities, and/or in

retaliation for requesting reasonable accommodations." Defendant asserts that the reference to a

reasonable accommodation was in the context of her retaliation claim, but there is no reason to

read the short explanation so narrowly; to the contrary, the Court is required to read the notice

liberally. Under these circumstances, it is reasonable to conclude that Plaintiff's assertion of a

failure to accommodate as a basis for retaliation would put Defendant and the EEOC on notice

that Plaintiff was also asserting a failure to accommodate claim. Although the explanations lack

much detail, reading the notice liberally, as the Court must, these sentences appear to raise a

claim for a failure to accommodate. See Canterbury v. Federal-Mogul Ignition Co., 418 F. Supp.

2d 1112, 1117 (S.D. Ia. 2006) (holding that the plaintiff exhausted his failure to accommodate

claim "[d]espite Plaintiff's failure to specifically state a claim for failure to accommodate in his

administrative charge"); Scott v. USBankCorp Card Servs., Inc., No. 97-306, 1998 WL 344341,

at *5 (D. Minn. May 14, 1998).

_____

[10] On June 23, 2011, Plaintiff filed an amended Notice of Charge of Discrimination, alleging discrimination under
GINA—a claim Plaintiff has now voluntarily dismissed. (See Docket No. 19 at 37-38). The amended charge did
not provide any additional information with regard to Plaintiff's other claims. (See id.)

Similarly, while the notice does not specifically use the words "hostile work environment," several sentences indicate that a reasonable inference could be drawn that Plaintiff was asserting a hostile work environment: 1) "I am subjected and expected to work outside of my restrictions"; 2) "I am subjected to discipline different from others outside of my protected statuses"; and 3) "My employment has been threatened by the Respondent."  Reading these sentences collectively, a reasonable employer would be put on notice that Plaintiff was asserting a hostile work environment claim because she believed she was given work beyond her capabilities, was subjected to more discipline than her co-workers, and was threatened to be fired.  Given that Plaintiff had explicitly alleged retaliation, these assertions of repeated retaliatory actions against her demonstrate that her hostile work environment claim is reasonably related to her retaliation claim.  See Robinson v. Napolitano, 2010 WL 358469, at *4 (D.S.D. Jan. 26, 2010) (finding the plaintiff's hostile work environment reasonably related to the plaintiff's allegations of continued retaliation).

Because "[a] plaintiff will be deemed to have exhausted administrative remedies as to allegations contained in a judicial complaint that are like or reasonably related to the substance of charges timely brought before the EEOC," Williams, 21 F.3d at 222, the Court finds that Plaintiff has sufficiently exhausted her remedies with respect to her failure to accommodate, retaliation and hostile work environment claims.

**b.  Some of Plaintiff's failure to accommodate, retaliation and hostile work environment claims are barred by the applicable statute of limitations**

Plaintiff alleges that she made requests for accommodation on the following dates: June 23, 2009, September 16, 2009, February 22, 2010, September 14, 2010, August 9, 2011, August 17, 2011, September 20, 2011, and June 20, 2012.  (Pl.'s Mem. of Law at 4).  Defendant argues that Plaintiff's failure to accommodate claims involving the alleged requests in 2009 and

February 2010 are untimely because any arguable accommodation requests took place more than one year before Plaintiff filed her charge of discrimination.  (Mem. of Law in Supp. at 17).

"Under the ADA, an employee must file a charge of discrimination-including failure to accommodate-within 300 days of the alleged discrimination."  Henderson v. Ford Motor Co., 403 F.3d 1026, 1032 (8th Cir. 2005).  Similarly, "[t]he MHRA requires that an employee file an administrative charge or bring a civil action within one year of the discriminatory practice."  Id. "These causes of action accrue the date on which the adverse employment action is communicated to the employee."  Id.; see also Radcliffe v. Securian Fin. Grp., Inc., 906 F. Supp. 2d 874, 888 (D. Minn. 2012) (explaining that "a denial of a request for accommodation constitutes a discrete act and is not part of a continuing violation" and holding that the plaintiff's claim[s] for failure to reasonably accommodate falling outside of the one-year statute of limitations are time-barred").

Here, Plaintiff filed her initial notice of a charge of discrimination on June 7, 2011.  (See Docket No. 19 at 35-36).  Therefore, Plaintiff's failure to accommodate claim is limited to those incidents in which Defendant denied Plaintiff's request for an accommodation after June 7, 2010. See Mortensen v. Hibbing Taconite Co., 2010 WL 2243557, at *6 (D. Minn. Jun. 1, 2010) (holding that because the plaintiff "filed his discrimination charge with the EEOC on November 19, 2008, . . . any conduct occurring prior to November 19, 2007, [was] time barred").

Although Plaintiff makes several references to the alleged requests for accommodation prior to this June 7, 2010, date throughout her memorandum, she makes no argument whatsoever that she may pursue any claims arising out of those alleged requests on the basis that such a request was refused prior to June 7, 2010.  Her only argument is that "Defendant's knowledge of Ms. Evanson's need for accommodations in 2009 does not mean it can avoid responsibility for

retaliating against Ms. Evanson in 2011 and beyond." (Pl.'s Mem. of Law at 9). While the foregoing argument is generally true, the basis of any alleged retaliation is the subject of Plaintiff's retaliation claim, not her failure to accommodate claim. Plaintiff has not demonstrated, nor even argued, that any of the alleged requests in 2009 and February 2010 were refused after June 7, 2010; thus, any failure to accommodate claims based on requests and denials prior to June 7, 2010, are time barred. See Finan v. Good Earth Tools, Inc., 2007 WL 3028190, at *7 (E.D. Mo. Oct. 15, 2007) (finding that the plaintiff's failure to accommodate claim was time-barred because "[t]he allegations underlying his failure to accommodate claim… occurred more than 300 days prior to" the date the charge of discrimination was filed and holding that "[t]he fact that defendants' denial of [the plaintiff's] requests for accommodation may have had a continuing impact on [him] does not convert the claim into a continuing violation").

Defendant has not argued that the remaining alleged requests for accommodation after June 7, 2010, are time barred, and they are discussed below.[11]

As to Plaintiff's hostile work environment claims, Defendant argues that it is unclear what specific incidents give rise to Plaintiff's hostile work environment claim but that none are based on adverse employment action taken after June 7, 2010. (Id. at 18).

Plaintiff appears to acknowledge that any harassment taking place prior to June 7, 2010, cannot be the basis of her claim, but she argues that "at a minimum, [the notice] include[s] all of the harassment that took place within 300-365 days of that charge as well as all of the ongoing harassment leading up to, and including Ms. Evanson's constructive discharge in January of 2013." (Id.)

_____

[11] As will be discussed below, Plaintiff fails to present any evidence to support her mere allegations that she made a request for an accommodation after June 7, 2010, that was denied by Defendant.

Reading the argument broadly, Plaintiff appears to argue that the statute of limitations does not bar her hostile work environment claim because of the "continuing violation" doctrine. In <u>Taxi Connection v. Dakota, Minnesota & Eastern R.R. Corp.</u>, 513 F.3d 823, 825-26 (8th Cir. 2008), the Eighth Circuit explained that, in the context of a hostile work environment claim, "[t]he continuing violation doctrine, applicable to MHRA claims, allows a plaintiff to avoid the running of the statute of limitations" because "each individual discriminatory act which is part of a continuing violation triggers anew the time period for reporting the entire pattern of discrimination, 'as long as at least one incident of discrimination occurred within the limitations period.'" (quoting <u>Smith v. Ashland, Inc.</u>, 250 F.3d 1167, 1172 (8th Cir. 2001)). However, the Eighth Circuit further explained that the question entirely focuses on whether there were underlying discriminatory acts taken within the relevant time period—not just their lingering effects. <u>Id.</u> Indeed, where a plaintiff fails to "allege any hostile working environment violation during the limitations period, the pre-limitation period evidence she proposes is irrelevant." <u>Smith v. Ashland, Inc.</u>, 250 F.3d 1167, 1173 (8th Cir. 2001). In other words, a plaintiff cannot bring a claim for a discriminatory act that took place in 2005, even though its effects may linger into 2010. Therefore, to the extent that Plaintiff here seeks to rely on any alleged underlying discriminatory acts occurring prior to June 2010, the claims are time barred.[12]

### c. Plaintiff's ADA and MHRA retaliation claims

In the absence of direct evidence of retaliation, the Court employs the familiar burden-shifting framework announced in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973); <u>Mershon v. St. Louis Univ.</u>, 442 F.3d 1069, 1074 (8th Cir. 2006). Here, Plaintiff agrees that no

---

[12] It should be noted, however, that with respect to Plaintiff's argument that her voluntary resignation in January 2013, is part of the hostile work environment, "[t]he continuing violation doctrine does not encompass discrete discriminatory acts, such as termination, failure to promote, denial of transfer, or refusal to hire, which are individually actionable." <u>Taxi Connection</u>, 513 F.3d at 825-26.

direct evidence exists.  (Pl.'s Mem. of Law in Opp'n at 9) ("Ms. Evanson agrees that the burden-shifting analysis under <u>McDonnell Douglas Corp.</u> applies to both her ADA and MHRA claims).  "Under this framework, the initial burden is on the plaintiff to establish a prima facie case, consisting of evidence: '(1) that he or she engaged in statutorily protected activity; (2) an adverse employment action was taken against him or her; and (3) a causal connection exists between the two events.'" <u>Stewart v. independent Sch. Dist. No. 196</u>, 481 F.3d 1034, 1043 (8th Cir. 2007) (quoting <u>Green v. Franklin Nat'l Bank of Minneapolis</u>, 459 F.3d 903, 914 (8th Cir. 2006)).  "If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to show a 'non retaliatory reason for the adverse employment action.'" <u>Id.</u>  (quoting <u>Green</u>, 459 F.3d at 914).  "If the defendant can show a legitimate, non-retaliatory reason for its actions, the burden returns to the plaintiff who 'is then obliged to present evidence that (1) creates a question of fact as to whether defendant's reason was pretextual and (2) creates a reasonable inference that defendant acted in retaliation.'" <u>Id.</u> (quoting <u>Logan v. Liberty Healthcare Corp.</u>, 416 F.3d 877, 880 (8th Cir. 2005)).

Although the amount of required evidence of pretext has been described as "minimal," it must still be more substantial than "it takes to make a prima facie case because unlike evidence establishing a prima facie case, evidence of pretext and retaliation is viewed in light of the employer's justification."  <u>Logan</u>, 416 F.3d at 881.

### i. Plaintiff has failed to make a prima facie case

To make out a prima facie case of retaliation, "a plaintiff must show that she (1) engaged in a protected activity, (2) that she suffered an adverse employment action, and (3) that the two events are causally connected."  <u>Henderson</u>, 403 F.3d at 1036.  The same analysis applies for a

retaliation claim under both the ADA and the MHRA.  See Partington v. Intek Plastics, Inc., No. 08-4614 (DSD/JSM), 2009 WL 5215338, at *4 (D. Minn. Dec. 28, 2009).

## 1. Plaintiff engaged in a protected activity

Although Defendant asserts that Plaintiff failed to specify the protected activity she engaged in, it acknowledges that requesting an accommodation is "protected activity."  (Mem. of Law in Supp. at 20); see Kirkeberg v. Canadian Pacific Ry., 619 F.3d 898, 908 (8th Cir. 2010). It argues, however, that "Plaintiff never requested an accommodation, and her medical notes only indicated limitations without requesting any accommodation," and thus, she fails to satisfy the first element of her burden.  (Id. at 21).

In her response, Plaintiff makes clear that her alleged protected activity was requesting an accommodation.  (See Pl.'s Mem. of Law in Opp'n at 10-12).  She argues that she "engaged in repeated acts of statutorily protected activity each and every time she formally requested accommodations, had conversations with her supervisors regarding her ongoing need for accommodations, and each time she sought assistance from her medical providers when Defendant requested clarification regarding the nature of her disabling conditions."  (Id. at 10).

Undoubtedly, "[a] disabled employee must initiate the accommodation-seeking process by making [her] employer aware of the need for an accommodation."  E.E.O.C. v. Convergys Customer Mgmt. Grp., Inc., 491 F.3d 790, 795 (8th Cir. 2007).  "Additionally, the employee must provide relevant details of [her] disability and, if not obvious, the reason that [her] disability requires an accommodation."  Id.

Here, while Plaintiff relies on numerous reports and letters from doctors and reports from Defendant's employees demonstrating that Plaintiff obtained several medical evaluations at Defendant's request, Plaintiff fails to identify any specific instance in which she said "I am

requesting a reasonable accommodation." However, the record of medical evaluations, purportedly obtained at the request of Defendant and later communicated to Defendant, demonstrate that Defendant was at least aware of Plaintiff's medical conditions and her difficulty of using the "Alice" software. While the mere existence of a medical condition is generally not enough to constitute a request for accommodation, and the Court more fully discusses Plaintiff's purported requests for accommodation with regard to her failure to accommodate claim below, the September 16, 2009, letter from Plaintiff captioned "Help!" at the very least creates a genuine issue of material fact as to whether Plaintiff made a request for an accommodation regarding the "Alice" program or whether Defendant voluntarily offered the accommodation. Additionally, Plaintiff testified in her deposition that she made requests to her supervisors for an accommodation. (See Karen Evanson Dep. 39:25 – 40:11, 42:4, May 17, 2013 [Docket No. 28, Ex. 2]). Ms. Utech also testified that Defendant was "aware of [Plaintiff] seeking accommodations before [2012], and [there were] lots of meetings about it," even though Ms. Utech did not believe that Plaintiff ever made a specific request for an accommodation based on a disability. (Susan Utech Dep. 42:21 – 43:1, May 17, 2013 [Docket No. 28, Ex. 1]). Therefore, there at least exists a genuine issue of material fact on whether Plaintiff engaged in protected activity.[13]

## 2. Plaintiff did not suffer an adverse employment action

"To establish an adverse employment action in the context of a retaliation claim, plaintiff must demonstrate that a reasonable employee would have found the defendant's actions 'materially adverse,' meaning they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Logan v. Chertoff, 2009 WL 3064882, at *12 (E.D.

---

[13] While any such requests for an accommodation prior to June 2010, cannot be the basis of Plaintiff's failure to accommodate claim because they are time-barred, this does not hinder Plaintiff's claim that she was later and timely retaliated against on the basis of her earlier requests for an accommodation.

Mo. Sept. 22, 2009) (quoting <u>Burlington Northern & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006)).  The material adversity requirement is necessary to "separate significant from trivial harms" because Title VII "does not set forth 'a general civility code for the American workplace.'"  <u>BNSF v. White</u>, 548 U.S. at 68 (quoting <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 527 U.S. 75 (1998)).  "The Eighth Circuit requires the plaintiff to show that the adverse employment activity 'produced significant harm' or 'materially significant disadvantage.'"  <u>Logan</u>, 2009 WL 3064882, at *12 (quoting <u>Buboltz v. Residential Advantages, Inc.</u>, 523 F.3d 864, 868 (8th Cir. 2008); <u>Devin v. Schwan's Home Service, Inc.</u>, 491 F.3d 778, 786 (8th Cir. 2007)).

Plaintiff fails to articulate any specific adverse action taken against her.  (<u>See</u> Pl.'s Mem. of Law in Opp'n at 12).  Rather, she argues that "the cumulative effect of Defendant's retaliatory conduct over the course of several years and to the varying degrees of hostility and reasonableness should be considered sufficiently adverse to survive a motion to dismiss."  (<u>Id.</u>)  First, the Court's review is under the motion for summary judgment standard, not a motion to dismiss standard.  Second, Plaintiff's reliance on her only cited case, <u>Fercello v. County of Ramsey</u>, 612 F.3d 1069, 1083-84 (8th Cir. 2010), is misplaced.

In <u>Fercello</u>, the Eighth Circuit stated that "it is proper to consider the cumulative effect of an employer's alleged retaliatory conduct," but it ultimately concluded that the actions of the defendant, taken as a whole, did "not constitute systematic retaliation capable of transforming otherwise lawful conduct into unlawful, retaliatory employment action."  612 F.3d at 1083-84.  The Court explained that although "a number of allegedly adverse actions took place" over the course of nineteen months, eventually leading to the plaintiff's resignation, the record "illustrate[d] a scattered assortment of actions that are either petty, unsubstantiated, or otherwise

causally unrelated to [the plaintiff's] protected conduct." Id. at 1084. Moreover, the record demonstrated "numerous efforts by the [defendant] to remedy conflicts and accommodate [the plaintiff's] needs." Id. There is no evidence of "extreme, systemic retaliatory conduct resulting in serious employment consequences." See Culpepper v. Dep't of Agriculture, 2010 WL 2757245, at *20 (E.D. Ark. Jul. 7, 2010).

Here, Plaintiff entirely fails to even articulate the specific, alleged adverse employment actions that she believes collectively demonstrate retaliatory action. It is not the role of the Court to search the record to assemble together a plausible series of adverse actions on behalf of a plaintiff. Judge v. Susee, No. 05–214 (PAM/JSM), 2006 WL 463534, at *7 (D. Minn. Feb. 24, 2006) ("The Court need not sift through the record to locate evidence to support Plaintiffs' argument."); Rodgers v. City of Des Moines, 435 F.3d 904, 908 (8th Cir. 2006). But even if the Court were inclined to do so, the only arguably plausible actions taken by Defendant that might be seen as "adverse" were scattered, petty and without any causal link to retaliation. Plaintiff cannot merely "label her discipline and co-worker comments as retaliatory." Donnelly v. St. John's Mercy med. Cntr., 635 F. Supp. 2d 970, 1002 (E.D. Mo. 2009). Moreover, similar to Fercello, the record here evidences Defendant's continuous efforts to accommodate Plaintiff's needs and all three of the discipline incidents imposed against her were in response to specific incidents in which she failed to abide by the policy on conduct -- facts she does not appear to dispute -- almost two years after the alleged request for accommodation.

Moreover, the two reprimands in this case do not constitute adverse employment actions in and of themselves because there has been no showing whatsoever that they "produced significant harm" or "materially significant disadvantage." Elnashar v. Speedway SuperAmerica, LLC, 484 F.3d 1046, 1058 (8th Cir. 2007) ("A reprimand is an adverse

employment action only when the employer uses it as a basis for changing the terms or conditions of the employee's job for the worse.").  In regard to the one-day suspension imposed on Plaintiff, suspensions, generally, can constitute adverse actions, at least where they result in a serious hardship; however, with regard to very short term suspensions, in particular one-day suspensions, the law is less settled.  Compare Anderson v. Department of Veterans Affairs, 2010 WL 582605, at *4 (E.D. Ark. Feb. 16, 2010) (holding that a two-day suspension did not satisfy the "materially adverse" standard); Chase v. Ashcroft, 2004 WL 2238793, at *13 (D. N.D. Sept. 29, 2004) (noting that "it is unclear whether the loss of only three days' pay should be considered a material employment disadvantage" but nevertheless giving the plaintiff "the benefit of the doubt, and find[ing] that in [that] circumstance, a three-day suspension without pay for conduct unbecoming an officer [was] evidence of an adverse employment action"); Embry v. Callahan Eye Found. Hosp., 147 Fed. Appx. 819, 829 (11th Cir. 2005) (finding that based on the plaintiff's $11.83 hourly salary, a one-day suspension did not constitute an adverse employment action); Bell v. City of Harvey, Ill., 2013 WL 3199976, at *5 (N.D. Ill. Jun. 21, 2013) (holding that "[a]bsent a stronger precedential statement to the contrary, [the] Court will not find a one-day suspension without pay, with no aggravating circumstances, to be a materially adverse action"); Coy v. Snyder, 2012 WL 4596921, at *3 (E.D. Mich. Oct. 2, 2012) ("[A] one day suspension is de minimus and not sufficient to constitute an adverse employment action."); Dobrynio v. Central Hudson Gas & Elec. Corp., 419 F. Supp.2d 557, 564 (S.D. N.Y. Mar. 9, 2006) ("I reject as a matter of law Plaintiff's contention that the loss of one day's pay worked a substantial change in the terms and conditions of his employment"), with Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456-57 (11th Cir. 1998) (holding that a one-day suspension collectively with other actions can be considered adverse employment action); Satterfield v.

United Parcel Service, Inc., 2003 WL 22251314, at *10 (S.D. N.Y. Sept. 30, 2003) (explaining

that a "one-day suspension . . . arguably does fall within the Second Circuit's definition of

'materially adverse' action since plaintiff presumably was forced to forego one day's worth of

wages"). Here, the Court need not decide the issue because even if the mere one-day suspension

could be considered an adverse employment action, it would fail for the further reasons

discussed in the next section below.[14]

Therefore, with the exception of the possibly one-day suspension, Plaintiff has not

demonstrated that she suffered any material adverse employment actions to support her

retaliation claims under the ADA and the MHRA.[15]

> ### ii.   Defendant has shown non-discriminatory reasons for its disciplinary actions and Plaintiff has failed to demonstrate they were a pretext for retaliation

With regard to the one-day suspension, even if for the sake of argument  it could be

considered an adverse employment action, Plaintiff has demonstrated a non-discriminatory

reason for the suspension that Plaintiff has not shown was a mere pretext.  The one-day

suspension arose out of an independent, specific incident, almost two years after Plaintiff first

discussed the need for accommodation.  "Generally, more than a [mere] temporal connection is

---

[14] Nor could the negative evaluation Plaintiff received prior to her resignation be considered an adverse action in and of itself.  See Burchett v. Target Corp., 340 F.3d 510, 518 (8th Cir. 2003) ("A negative performance review is not in itself an adverse employment action, however, and it is actionable only if the employer subsequently uses that review to alter the terms or conditions of employment to the detriment of the employee.").

[15] Plaintiff has not specifically asserted that the "constructive discharge" was the adverse action upon which she basis her claim.  Even if she did, however, it would fail.  "To prove a case of constructive discharge, a plaintiff must show (1) a reasonable person in [her] situation would find the working conditions intolerable, and (2) the employer intended to force [her] to quit." Carpenter v. Con-Way Cent. Express, Inc., 481 F.3d 611, 616 (8th Cir. 2007).  Just as in Fercello, even if Plaintiff "established that the conditions were sufficiently intolerable," which she has not, "there is no evidence that the County intended to force [Plaintiff] to quit or that it could have reasonably foreseen that she would do so." 612 F.3d at 1083.  To the contrary, the record indicates numerous instances demonstrating that Defendant sought to "maintain an employment relationship with [Plaintiff], not force her to quit."  Id.  Indeed, Defendant in the present case provided continuous efforts to accommodate Plaintiff, employed her for almost four years after the inception of her accommodations request, and continued her employment (without any alleged retaliatory incidents) even after Plaintiff filed her charge of discrimination.

required to present a genuine factual issue on retaliation, and only in cases where the temporary proximity is very close can the plaintiff rest on it exclusively." Tyler, 628 F.3d at 986 (internal quotation marks and citation omitted). "As more time passes between the protected conduct and the retaliatory act, the inference of retaliation becomes weaker and requires stronger alternate evidence of causation." Id. "The inference vanishes altogether when the time gap between the protected activity and the adverse employment action is measured in months." Id. (citing several Eighth Circuit cases holding that gaps of seven months, six months, and even two months were insufficient to show "causation for purposes of establishing a retaliation claim"). In the absence of any evidence to show that the Plaintiff's one-day suspension in 2011 was at all related to Plaintiff's 2009 request for accommodation, the two-year gap demonstrates no inference of retaliation. See Recio v. Creighton Univ., 521 F.3d 934, 941 (8th Cir. 2008) (events six months later were "not close enough to raise an inference of causation"); Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) ("Action taken . . . 20 months later suggests, by itself, no causality at all."). Additionally, Defendant has introduced evidence that the one-day suspension in 2011 was imposed not only against Plaintiff but also against two other employees who refused to participate in the confidential health insurance survey (which resulted in the Defendant being unable to obtain lower cost insurance for the benefit of all its employees).

Furthermore, even if Plaintiff was able to make a prima facie case for her retaliation claim for any of the disciplinary actions discussed above, Defendant has articulated a non-discriminatory reason for all of its possible actions and the Plaintiff has entirely failed to demonstrate those non-discriminatory reasons were merely a pretext. The two verbal and written reprimands given to Plaintiff were a result of her violation of workplace and CBA policies requiring notice to supervisors if an employee was going to miss work that ultimately had no

impact on the terms and conditions of her employment. Plaintiff has made no showing that these reprimands were in any way pretextual.[16] Although Plaintiff makes the conclusory argument that her reprimands were the result of Plaintiff's failure to be accommodated (i.e., she missed time because she was not accommodated), (see Pl.'s Mem. of Law in Opp'n at 13), she entirely fails to explain why because of her alleged disability she could not comply with the policies for giving prior notice to a supervisor if she was going to miss work for medical appointments.

Plaintiff has not identified any material, admissible evidence by which she can demonstrate sufficient circumstantial evidence to permit the Court to reasonably infer that any of the isolated disciplinary actions described above were based on a motive for retaliation by Defendant in light of Plaintiff's 2009 request for accommodation.

Therefore, for the reasons discussed above, the Court recommends that Defendant be granted summary judgment on Plaintiff's retaliation claims.

### d. Plaintiff's ADA and MHRA failure to accommodate claims[17]

The ADA and the MHRA require that an employer provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112 (b)(5)(A); Fenney v. Dakota, Minnesota & Eastern R. Co., 327 F.3d 707, 711 (8th Cir. 2003).

For a failure to accommodate claim, the Court employs a "'modified burden-shifting analysis,' because a discriminatory intent is not at issue." Mershon, 442 F.3d at 1074. Under

---

[16] In fact, Plaintiff does not dispute that she missed or failed to return to work without providing her supervisors with the required notice.

[17] Again, the MHRA and ADA failure to accommodate claims are analytically similar. See Fenney v. Dakota, Minnesota & Eastern R. Co., 327 F.3d 707, 711 n.5 (8th Cir. 2003). The MHRA "parallels the ADA." Id.

this standard, "the employee must first make a facial showing that [s]he has an ADA disability and that [s]he has suffered an adverse employment action. Then [s]he must make a facial showing that [s]he is a 'qualified individual.'" Brannon v. Luco Mop. Co., 521 F.3d 843, 848 (8th Cir. 2008) (internal quotation marks omitted). "To be a 'qualified individual' within the meaning of the ADA, an employee must '(1) possess the requisite skill, education, experience, and training for her position, and (2) be able to perform the essential job functions, with or without reasonable accommodation.'" Fenney, 327 F.3d at 712 (quoting Heaser v. Toro Co., 247 F.3d 826, 830 (8th Cir. 2001)). "Although the plaintiff retains the ultimate burden of proving that [s]he is a qualified individual, if the employer disputes that the employee can perform the essential functions of the job, then the burden shifts to the employer to 'put on some evidence of those essential functions.'" Id.

> [I]f the employee cannot perform the essential functions of the job without an accommodation, he must only make a "facial showing that a reasonable accommodation is possible . . . ." "The burden of production [then] shifts to the employer to show that it is unable to accommodate the employee." "If the employer can show that the employee cannot perform the essential functions of the job even with reasonable accommodation, [then] the employee must rebut that showing with evidence of his individual capabilities." "At that point, the employee's burden merges with his ultimate burden of persuading the trier of fact that he has suffered unlawful discrimination."

Id. (internal citations omitted).

Additionally, even if a plaintiff can show she suffered an adverse employment action, an employer satisfies its statutory duty when it engages "in the interactive process with plaintiff in a good faith effort to accommodate her disability." Donnelly v. St. John's Mercy Med. Cntr., 635 F. Supp. 2d 970, 995-96 (E.D. Mo. 2009). "Where the employee requests accommodation, the employer must engage in an 'informal, interactive process' with the employee to identify the limitations caused by the disability and the potential reasonable accommodations to overcome

those limitations." Battle v. United Parcel Serv., Inc., 438 F.3d 856, 862 (8th Cir. 2006) (quoting

Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 951 (8th Cir. 1999)). "An employer hinders

this process when: the employer knows about the employee's disability; the employee requests

accommodations or assistance; the employer does not in good faith assist the employee in

seeking accommodations; and the employee could have been reasonably accommodated but for

the employer's lack of good faith." Id.

Defendant argues that it "provided reasonable accommodations for Plaintiff's known

limitations." (Mem. of Law in Supp. at 23). Specifically, Defendant points to the

accommodations for allowing Plaintiff to handwrite intake information that would later be

entered into the computer using the "Alice" software by other staff and permitting Plaintiff to

work day shifts. (See Id.) Defendant also asserts that Plaintiff never informed Defendant that

the accommodations were inadequate, and in fact, on several occasions, Plaintiff rebutted

Defendant's inquiries as to whether additional accommodations were necessary. (See Id. at 23-

24).

Plaintiff in large part ignores the relevant legal standard and merely argues that Plaintiff

informed Defendant of the need for an accommodation and that Defendant knew of the need for

an accommodation. (See Pl.'s Mem. of Law in Opp'n at 13-14). Plaintiff also argues that

Defendant did not take action to address issues arising from the implemented accommodations;

however her entire argument on this point is not that she could not perform the essential

functions of her job as a result of any failure to accommodate, rather, Plaintiff here argues that

because of the accommodations provided by Defendant, some of her co-employees became more

hostile toward her as a result of having to perform some of her job functions. (Id. at 14-15).

Neither party actually addressed the questions of whether Plaintiff has an ADA disability or whether she is a qualified individual under the ADA. While Defendant states that it "does not concede that Plaintiff is a 'qualified individual' with a 'disability' under the ADA or MDHR," (Mem. of Law in Supp. at 23 n.6), it has not argued that it is entitled to summary judgment on this basis. Therefore, the Court need not delve into the issue and assumes for purposes of this motion that Plaintiff has an ADA disability and that she is a qualified individual. See Jones v. Bracco Ltd. P'ship, 2013 WL 696381, at *11 (D. S.D. Feb. 26, 2013) (explaining that "[t]he court need not delve deep into the modified burden-shifting analysis because [the defendant] ha[d] only raised one issue specific to [the plaintiff's] failure to accommodate claim—whether [the plaintiff] gave [the defendant] sufficient notice of her disability and request for accommodation"). The Court need only consider Defendant's primary argument that Plaintiff's claim fails because she has not identified any specific requests for further accommodation after the 2009 requests for an accommodation (i.e., related to the "Alice" software program and day shifts) which Defendant argues were properly accommodated.

"The 'predicate requirement' triggering the interactive process is the employee's request for the accommodation." Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1045 (8th Cir. 2005). "A mere assertion that an accommodation is needed is insufficient; the employee must inform the employer of the accommodation needed." Id. "Employees and employers have a shared responsibility in resolving accommodation requests," and the employee must not only "initiate the accommodation process by making the employer aware of the need for an accommodation," but also must "provide relevant details of his/her disability and the reasons that the disability requires the requested accommodation." Stipe v. Shinseki, 690 F. Supp. 2d 850, 878 (E.D. Mo. 2010) (internal citations omitted). Where a request for an accommodation was never made, the

employer is entitled to summary judgment.  E.E.O.C. v. Prod Fabricators, Inc., No. 11-2071 (MJD/LIB), 2013 WL 1104731, at *11 (D. Minn. Mar. 18, 2013).

Plaintiff cites numerous post-2009 letters and exhibits without explanation or analysis on why each specific communication from Plaintiff constituted a distinct request for an accommodation under the applicable law.  (See Pl.' Mem. of Law in Opp'n at 11).  Rather, Plaintiff in conclusory fashion merely states that "there is documentation of [Plaintiff's] repeated requests for accommodations and evidence of Defendant's actual knowledge of the nature and extent of her disabilities and need for accommodations."  (Pl.'s Mem. of Law in Opp'n at 14). Again, it is not the role of the Court to mine the record in an attempt to ferret out any potential claims.  Nevertheless, the Court considers whether any of referenced communications can be considered to evidence a request for an accommodation.

As already noted above, the record demonstrates that Plaintiff did make requests for accommodations with regard to her memory and her fatigue in September 2009 when she sent a memorandum to Bonnie Kolodge.  (See Docket No. 23 at 16).  However, this request is barred by the statute of limitations and cannot be the basis for her failure to accommodate claims.  The same is true for the June 2009 and February 2010, notes received from Plaintiff's treating physician.  (See Docket No. 23 at 15, 17).[18]

---

[18] In her supplemental letter brief submitted to the Court, Plaintiff also appears to raise new claims that she had asked for an accommodation after returning from her leave based on her stroke, prior to the implementation of the "Alice" software, but all such claims are still prior to 2009 and would also be untimely. (See Letter to Magistrate Judge [Docket No. 30] at 1).  Furthermore, the Court's review of Plaintiff's inconsistent deposition testimony as to whether she had any difficulties after she returned to work after her stroke, at most demonstrates that she could not remember any difficulties she had with work expectations after suffering her stroke but before the implementation of the "Alice" computer software system.  (See Karen Evanson Dep. 30:14 – 31:2, 34:7 – 35:11, May 17, 2013 [Docket No. 28, Ex. 2]).  While Plaintiff claimed at one point in her deposition that she could not perform certain duties with the computer and that she had reported them to her then supervisor, which she seemed to refute shortly after in her deposition, she failed to introduce any specific facts to create a genuine issue of material fact that she made any specific request for an accommodation.  Moreover, Plaintiff herself admitted that her supervisor was very "understanding" when Plaintiff allegedly communicated these issues, that no discipline was every imposed against her for any of these difficulties she was having, and that her supervisor "figured out a way that those tasks would be taken care of without [Plaintiff] doing them"—in other words, any alleged difficulties she had were accommodated.

With regard to the September 2010, note from Plaintiff's physician, which is identical to the February 2010 note, the only plausible accommodation it might pertain to is Plaintiff's fatigue and request for a work schedule with early daytime hours rather than evening hours. (See Docket No. 23 at 18). However, even if this doctor's note could be considered a request by Plaintiff for an accommodation, Plaintiff makes no argument that this request for an accommodation was ignored in any way, and there is no basis on the record before the Court for such an argument. The record clearly demonstrates that Defendant took actions to accommodate Plaintiff's fatigue limitations and changed Plaintiff's work schedule such that she only worked past 4:30 p.m. on a handful of occasions for the following three years after Plaintiff provided a copy of the identical and earlier February 2010 note. (Aff. of Susan Utech ¶ 13); (Docket No. 17 at 1-37 and Docket No. 18 at 1-38) (providing all of Plaintiff's time sheets). Indeed, Plaintiff acknowledged in her deposition that Defendant fully accommodated her request for the daytime work schedule. (See Karen Evanson Dep. 63:10 - 24, May 17, 2013 [Docket No. 28, Ex. 2]).

As to the August 17, 2011, letter Plaintiff sent to Ms. Utech, it makes no request for an accommodation whatsoever. (See Docket No. 23 at 35). Rather, the letter almost exclusively discusses some co-employee hostility, as perceived by Plaintiff—it does not make any request for any job duties accommodation. While it makes a passing reference that Plaintiff does not believe her supervisors were "trying to accommodate [her] in any way" during an August 1, 2011, meeting, it provides no statements of fact as to what accommodation Plaintiff makes reference, when such a request for an accommodation might have been made, nor any further details regarding what the basis of the purported accommodation would have been. Therefore,

---

(See Id. 32:11 – 33:21). Additionally, Plaintiff admits that she never proposed any accommodation or alternative other than the accommodation of having her coworkers enter the data into "Alice" on Plaintiff's behalf. (See Id. 42:18 – 43:2). Therefore, even if Plaintiff's claims related to any difficulties she may have had after returning to work from her stroke were not time barred, there has been no showing of specific facts to demonstrate that she made a request for an accommodation, much less that any such request was not accommodated.

the August 2011, letter also does not present any material facts to demonstrate that Plaintiff at any time after 2009 or 2010 made a request for an accommodation different from her request regarding the "Alice" software or daytime work shifts previously discussed.

With regard to a note from Plaintiff's physician dated September 20, 2011, this too does not evidence any request for an accommodation beyond the ones already made in 2009 and 2010. (See Docket No. 23 at 36). The note merely states that "[a]ccommodations should be made so that [Plaintiff] does not do data entry on the computer." (Id.) But Plaintiff makes no argument whatsoever that Defendant at any time required Plaintiff to enter data into the computer. To the contrary, Defendant has stated, and Plaintiff has not disputed, that the request for handwriting notes without entering them into the "Alice" software continued to be an accommodation Defendant made right up through the time Plaintiff resigned her employment with Defendant.

Finally, Plaintiff references a June 20, 2012, email from Plaintiff to Ms. Utech. (See Pl.'s Mem. of Law in Opp'n at 11). This brief email recounts Plaintiff's troubles with entering information into the "Alice" program and then asks for advice on "how to handle" her co-workers' irritations and "maintain good co-worker relations." (Docket No. 23 at 41). It in no way makes any request for any additional accommodations with regard to a physical disability Plaintiff was suffering, beyond what was already being done to accommodate her issues with "Alice." At most, it appears to simply request general advice for how to deal with her inter-office relationships with her co-workers. However, Plaintiff has provided no authority at all that the mere unhappiness of co-workers in regard to an accommodation provided to an employee by an employer can be a basis for a failure to accommodate claim against the employer. Plaintiff's reliance on two instances in which she perceived a negative reaction from a co-worker when asking for assistance and later had to seek help from her supervisor is misplaced. This is no

different than any other instance in which an employee refuses to go above and beyond the duties of their job to assist a co-worker, and Plaintiff has demonstrated no legal basis upon which the employer could be held liable under such circumstances. As previously noted, Title VII analysis as applied to ADA claims "does not set forth 'a general civility code for the American workplace.'" BNSF v. White, 548 U.S. at 68. This is not a situation where Plaintiff was unable to perform her essential job functions and asked for and was denied an accommodation from Defendant to accommodate her limitation.[19]

In summary, Plaintiff has not provided material evidence of any instances post-2009 or 2010, and within the statute of limitations, where Plaintiff made a further, specific request for an accommodation that Defendant failed to reasonable accommodate beyond the previously requested and provided accommodations for Plaintiff regarding entry of data into the "Alice" software and assignment to day work shifts. Plaintiff has failed to cite to any evidence in the record to raise a genuine dispute of material fact and Defendant denied any specific, new requests for accommodation after June 2010. While Plaintiff makes vague arguments regarding instances in which there were meetings between Defendant and Plaintiff to discuss her then already existing accommodations, she has made no specific showing of facts in the record to establish a fact dispute that she at any time requested further accommodations beyond what was already in place. Mere general and conclusory assertions are not enough to survive summary judgment. See Mershon, 442 F.3d at 1077. Without pointing to some admissible evidence that Defendant refused to accommodate a subsequent request for a specific accommodation, her failure to accommodate claims fail. See Mole v. Buckhorn Rubber Prods., Inc., 165 F.3d 1212,

---

[19] Moreover, the Court notes that Plaintiff in her deposition admitted that when Plaintiff complained of some irritation from co-workers regarding their entry of data into "Alice" on Plaintiff's behalf, an accommodation was in fact made so that Plaintiff would give her paper data sheets to her supervisors directly, which eliminated that issue with co-workers. (See Karen Evanson Dep. 49:8 – 55:18, May 17, 2013 [Docket No. 28, Ex. 2]).

1218 (8th Cir. 1999) (holding that the plaintiff could not "expect the employer to read her mind and know she secretly wanted a particular accommodation and then sue the employer for not providing it" (quoting Ferry v. Roosevelt Bank, 883 F. Supp. 435, 441 (E.D. Mo. 1995)). Where an employer has no reason to know of a limitation, no accommodation is required. See Liljedahl, 341 F.3d at 843; Jones, 2013 WL 696381, at *11 ("An employer has no duty to accommodate if the employee fails to make a request for an accommodation.").[20]

Therefore, the Court recommends that Defendant be granted summary judgment on Plaintiff's failure to accommodate claims.

### e. Plaintiff's hostile work environment claim

To state a claim for a hostile work environment under the ADA, Plaintiff must demonstrate that "[s]he is a member of the class of people protected by the statute, that [s]he was subject to unwelcome harassment, that the harassment resulted from [her] membership in the protected class, and that the harassment was severe enough to affect the terms, conditions, or privileges of [her] employment." Shaver v. Independent Stave Co., 350 F.3d 716, 720 (8th Cir. 2003). Where the alleged harassment is by a non-supervisory co-worker, Plaintiff must also establish that "the employer knew or should have known of the harassment and failed to take prompt and effective remedial action." Carter v. Chrysler Corp., 173 F.3d 693, 700 (8th Cir. 1999).

As to evidence of unwelcome harassment, Plaintiff's mere arguments in her initial memorandum, without factual citation, are as follows:

---

[20] Plaintiff also references an August 2011, note from a "Beth," as support that Plaintiff made a later request for an accommodation. First, there is no evidence in the record to authenticate the note from this individual such that it could be considered admissible evidence. Indeed, Plaintiff herself had no knowledge of the note at the time it was written and did not know about it until she received a copy of her personnel file—in other words, Plaintiff cannot attest as to who wrote the note. Furthermore, Plaintiff's conclusory reference to the note, without any explanation as to why it evidences that Plaintiff made a request for an accommodation is insufficient. Moreover, the Court's independent review of the content of the note did not reveal any support for such an assertion.

> The evidence on this point stands for itself. Ms. Utech, the supervisor of Defendant's shelter, took enough time to send letters, single spaced, several pages long, to Ms. Evanson replete with harsh criticism of alleged inadequacies on Ms. Evanson's part. Ms. Evanson's recourse to this treatment was to be sat down with Ms. Utech and Ms. Utech's immediate subordinates and forced to engage in an "interactive" discussion that generally consisted of Ms. Utech and her subordinates haranguing Ms. Evanson until Ms. Evanson grew so upset that she had to leave and seek medical treatment shortly thereafter. Ms. Utech's style of management is abrupt, dismissive, and unsupportive of Ms. Evanson and her need for assistance to remain a full-time employee in good standing. Ms. Evanson was owed more under both state and federal law.

(Pl.'s Mem. of Law in Opp'n at 15-16).

In her supplemental letter brief, Plaintiff cited the Court to instances in her own deposition where she described some criticisms she received from her superiors and the subjective emotional effect they had on her. (See Docket No. 30 at 2) (citing Karen S. Evanson Dep. [Docket No. 28, Ex. 2] at 69, 113, 135). Plaintiff's allegations that her supervisor may have been strict toward her or critical of her performance fall woefully short of the necessary showing for a harassment claim. And during extensive questioning, Plaintiff failed to identify in her deposition testimony any instances on which she received particularly harsh criticisms. (See Karen Evanson Dep. 66:16 – 73:7, May 17, 2013 [Docket No. 28, Ex. 2]).

"In order to be actionable, harassment must be both subjectively hostile or abusive to the victim and 'severe and pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive.'" Shaver, 350 F.3d at 721 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993)). "[A]nti-discrimination laws do not create a general civility code . . . [and] [c]onduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law." Id. (concluding that coworkers'—including supervisors—use of the nickname "plate head" was not objectively offensive such that it could support a claim for a hostile work environment).

Plaintiff has failed to demonstrate that any subjective belief of harsh criticisms she may have carried is objectively sufficiently severe so as to support a claim for a hostile work environment. Indeed, this Court has previously granted summary judgment in favor of a defendant in light of much more troubling circumstances. See Miller v. Stifel, Nicolaus & Co. Inc., 812 F. Supp. 2d 975, 986 (D. Minn. Sept. 2011) (citing numerous Eighth Circuit decisions granting summary judgment on a hostile work environment claim, including: where "allegations that Plaintiff was denied a route assistant, was unfairly disciplined, paid less than the male workers, was not allowed to expense pay phone calls, and was required to make inventory changes on the computer, at best, amounted to a frustrating work environment rather than an objectively hostile work environment"; "employee's 'frustrating work situation' characterized by her being excluded from the decision-making process, treated with disrespect, subjected to false complaints, and curtailed in her supervisory duties did not amount to hostile work environment"; "concluding that unfair criticism and being yelled at did not amount to actionable harassment"; "finding that employer's scrutiny of employee's work, 'while unpleasant and annoying' did not amount to hostile work environment"); see also Hannoon v. Fawn Engineering Corp., 324 F.3d 1041, 1048 (8th Cir. 2003) (criticism of employee, including regarding his body odor, did not support a hostile work environment).

Therefore, for all the reasons stated above, the Court recommends that Defendant be granted summary judgment on Plaintiff's hostile workplace claims.

### III.     CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1) Defendant's motion for summary judgment [Docket No. 12] be **GRANTED** as more fully described above;

2) Judgment be entered accordingly

Dated:  October 2, 2013                                        s/Leo I. Brisbois
                                                               LEO I. BRISBOIS
                                                               United States Magistrate Judge

**N O T I C E**

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by October 16, 2013**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within seven days of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.