# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| KAREN S. EVANSON, | Civil No. 12-1195 (JRT/LIB) |
| Plaintiff, | |
| | **MEMORANDUM OPINION AND ORDER ON REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE** |
| v. | |
| SAFE HAVEN SHELTER, | |
| Defendant. | |

Stephanie M. Balmer, **FALSANI BALMER PETERSON QUINN & BEYER**, 306 West Superior Street, Suite 1200, Duluth, MN  55802, for plaintiff.

Scott A. Witty, **HANFT FRIDE PA**, 130 West Superior Street, Suite 1000, Duluth, MN  55802, for defendant.

Plaintiff Karen Evanson brings claims under the Americans with Disabilities Act ("ADA") and the Minnesota Human Rights Act ("MHRA") alleging that her former employer, Defendant Safe Haven Shelter ("Safe Haven") discriminated against her by failing to provide her with reasonable accommodations and creating a hostile work environment.  Evanson also alleges that Safe Haven retaliated against her for requesting reasonable accommodations.  The matter came before United States Magistrate Judge Leo I. Brisbois on Safe Haven's motion for summary judgment.  In an October 2, 2013 Report and Recommendation ("R&R"), the Magistrate Judge recommended that the Court grant Safe Haven's motion and dismiss Evanson's claims.  Evanson filed timely objections to the R&R.  The Court will sustain Evanson's objections to the extent she

contends that the Magistrate Judge erred in finding that she did not request a reasonable accommodation from Safe Haven within the statute of limitations.  Although Evanson requested a reasonable accommodation within the statutory time period, the Court concludes that, based on the evidence presented, no reasonable jury could find that Safe Haven discriminated or retaliated against Evanson because of her disability. Accordingly, the Court will adopt the Magistrate Judge's recommendation and grant Safe Haven's motion for summary judgment.

## BACKGROUND[1]

### I.   EVANSON'S EMPLOYMENT

#### A.   The Woman's Advocate Position

In May 2007, Evanson was hired by Save Haven as a part-time woman's advocate ("advocate").  (Aff. of Susan Utech, ¶ 3, Apr. 5, 2013, Docket No. 15.)  On November 1, 2008, Evanson became a full-time employee.  (*Id.*; Decl. of Kathleen A. Norton, Ex. 2 (Dep. of Karen S. Evanson ("Evanson Dep.") 16:11-15), June 27, 2013, Docket No. 28.)

---

[1] Evanson objects generally to the Magistrate Judge's recitation of the facts, but does not provide any citations to the record in support of her position.  (*See* Pl.'s Objections to R&R at 1-2, Oct. 16, 2013, Docket No. 33.)  For example, Evanson argues that "the Court failed to include Plaintiff's version of events with respect to the meetings she would have with her supervisors. The Court referenced only Defendant's version and failed to account for the differing descriptions."  (*Id.* at 2.)  Evanson's objections do not indicate what her version of the events is or how the R&R failed to account for her version of events when it cited to her own deposition describing the contents of the meeting.  (R&R at 4, Oct. 2, 2013, Docket No. 32.)  Although Evanson's objections to the facts are vague and do not direct the Court to the record evidence she relies upon in support of her contentions, the Court recites the factual background in full based upon the parties description of the facts in their summary judgment briefs in order to adequately perform a *de novo* review of the objections Evanson has raised regarding the Magistrate Judge's legal conclusions.

Safe Haven is a non-profit organization that provides a safe environment and resources for women and children that are the victims of domestic abuse. (Utech Aff. ¶ 2.) As an advocate, Evanson's responsibilities included fielding incoming crisis calls from domestic violence victims, completing new resident intakes, establishing safety plans for residents, assisting residents in obtaining services, distributing supplies, providing transportation, and attending to other needs of shelter residents. (*Id.* ¶ 4, Ex. B; *see also* Evanson Dep. 17:14-21.)[2] Additionally, advocates are required to maintain accurate records regarding the shelter's residents and services provided at Safe Haven. (Utech Aff. ¶ 5.)

In a January 2007 performance evaluation Evanson received "fair" marks for work quality, initiative, and skill building on a scale of excellent, very good, good, fair, and unsatisfactory. (Decl. of Karen S. Evanson, Ex. A at 6, Apr. 26, 2013, Docket No. 23.) She received "good" ratings for flexibility and job knowledge, and an "excellent" rating for punctuality. (*Id.*) The evaluation noted that Evanson "needs to call supervisors for problems or questions – not other staff" and that she needed to begin getting "out of [the] office more" and "documenting contacts with women" at the shelter. (*Id.*) A June 2007 evaluation also yielded "fair" marks for work quality and initiative, with "good" ratings for skill building and job knowledge, and "excellent" ratings for dependability, flexibility, and punctuality. (*Id.*, Ex. A at 8.) The evaluation noted that Evanson "needs

---

[2] The exhibits to the Utech Affidavit were filed at four different docket numbers. Exhibits A through F appear at Docket Number 16, Exhibit G appears at Docket Numbers 17 and 18, and Exhibits H through L appear at Docket Number 19. This Order will refer to each of the exhibits as "Utech Aff., Ex." with the corresponding exhibit letter. With the exception of depositions, references to page numbers in the parties' exhibits refer to the CMECF pagination.

to complete stats after every shift worked" and her goal for the coming year should include "training on the phone, computer." (*Id.*)  Additionally the evaluation indicated that when Evanson was not "busy in [the] office [she] should be on [the] floor working/talking with women.  No knitting, reading . . . in [the] office." (*Id.*)  The evaluation again noted that Evanson "needs to ask [her] supervisor if [she] has questions." (*Id.*)

### B.    Evanson's Stroke

Evanson suffered a stroke in November 2007.  (Evanson Dep. 21:5-9, 23:15-18, 24:17-18.)  Following the stroke she requested, and was granted, leave from Safe Haven, and returned to work in January 2008.  (*Id.* 26:19-27:7; Utech Aff. ¶ 6.)  Evanson testified that after experiencing the stroke her "[s]hort-term memory was gone." (Evanson Dep. 25:5-6.)  She also testified that upon returning to work she began having issues performing the essential functions of her position as an advocate.  (*Id.* 27:25-28:3.)  Specifically, she had trouble with "[a]nything that had to do with the computer if it was something that I didn't do on a daily basis." (*Id.* 28:4-10.)  Evanson did not, however, complain about any difficulties or request any accommodations from Safe Haven in the period of time shortly after returning from her leave.  (Pl.'s Mem. in Opp. to Mot. for Summ. J. at 3, Apr. 26, 2013, Docket No. 22.)

### C.    Alice Program

In December 2008, Safe Haven began using a new software program called "Alice" to collect and store data regarding residents and services.  (Utech Aff. ¶ 7.)  Prior

to the implementation of Alice, the information tracked by Safe Haven's advocates regarding residents and services was maintained on paper forms. (Evanson Dep. 37:8-22.) The process of implementing Alice extended into 2009. (Utech Aff. ¶ 8; Norton Decl., Ex. A (Dep. of Susan T. Utech ("Utech Dep.") 13:11-13).) Evanson could not recall whether any training on Alice was provided, but did remember someone explaining to her how to use Alice. (Evanson Dep. 36:15-37:4, 38:15-24.) Utech testified that although there was one formal training session for Safe Haven staff members on use of Alice, learning the program had "mostly been trial and error." (Utech Dep. 13:17-14:6.)

### D.   Accommodations

Evanson testified that because of issues with her short term memory, she could not remember how to use Alice on a day to day basis. (Evanson Dep. 28:22-29:1, 39:3-19.) At some point in 2009, shortly after Alice's implementation, Evanson explained to her supervisors, Bonnie Kolodge and Janet Olson, that she was having difficulty with Alice. (*Id.* 31:24-32:4, 39:25-40:8. 44:17-23.)[3] Evanson testified that after she raised the issue of her difficulties with Alice, Safe Haven instructed her to write down the relevant data, and Safe Haven would then have a different advocate enter that information into Alice. (*Id.* 40:11-18, 41:16-20; *see also* Utech Aff. ¶ 11.) Evanson did not believe this was an

---

[3] Defendants contend that "Evanson never 'asked' for an accommodation with respect to her memory/learning issues. Instead, Safe Haven management recognized her difficulties with Alice and worked to find an accommodation that allowed Ms. Evanson to continue to perform the essential functions of her position." (Utech Aff. ¶ 11.) The Court however, recites the facts in the light most favorable to Evanson, and does not consider this evidence, but rather relies on Evanson's deposition testimony that she informed her supervisors of the difficulties she was experiencing with Alice.

adequate accommodation because she "felt that it was not up to my fellow advocates to do my job." (Evanson Dep. 40:19-24, 41:21-23.) Evanson testified that she told her supervisor she disagreed with the accommodation because she did not want to place that burden on her coworkers. (*Id.* 41:21-42:17.) Thereafter, Kolodge instructed Evanson to give the handwritten forms Evanson completed to her supervisors rather than her coworkers. (*Id.* 47:13-21.) Evanson testified that this alleviated her concern at the time about coworkers performing her job. (*Id.* 47:22-48:3.) Specifically, Evanson testified that if she was giving the handwritten forms to supervisors she had "no reason to be concerned about [her] coworkers doing [her] work because supervisors would, in fact, be entering that information." (*Id.* 62:21-25.) But although she had been instructed to give her handwritten forms to supervisors, Evanson sometimes gave the forms to coworkers instead. (*Id.* 51:16-24.) Evanson testified that the accommodation was "making a lot of the . . . girls resent me in the office." (*Id.* 48:15-16.)[4]

Evanson continued to use this accommodation of handwriting information for others to enter into Alice until her resignation in 2013. (*Id.* 43:7-13.) Evanson testified that, other than the handwriting option, she could not think of a possible accommodation

---

[4] In a letter dated June 23, 2009, Evanson's primary physician notified Safe Haven that he had been asked to clarify an issue related to Evanson's health and explained that Evanson "has significant difficulties with short-term memory formation and retrieval, which make it difficult and at times impossible for her to successfully learn new tasks or processes. This is the direct result of a medical event she suffered in 2007 and is not reversible." (Utech Aff., Ex. D.) It is unclear from the record whether the physician's letter was received before or after Evanson raised the issue of her difficulties with Alice to Kolodge and Olson. But Evanson indicated that she requested this letter because Safe Haven "had asked for more information about my work abilities." (Evanson Decl. ¶ 5.)

that would have allowed her to perform the job function of entering data into Alice. (*Id.* 42:18-43:6.)   Evanson never proposed a different alternative to Safe Haven or requested an alternative accommodation because she "didn't know what else could be done." (*Id.* 42:18-43:2; *see also* Utech Aff. ¶ 14.)

In a September 16, 2009 memo to Kolodge entitled "Help!" Evanson stated "[a]s you know, I write everything down so I don't forget ('I had a stroke, you know!')." (Evanson Decl., Ex. D at 16.)  In the memo Evanson explained:

> I had a hot-line call this morning and I asked [redacted coworker name] if she would put it in Alice.  She was upset by this and asked me if Bonnie was the one that was supposed to do this?  I would then, not let her help me.  I don't like to depend on the other staff.  I am afraid they will resent me.  Maybe they don't understand.  What can I do? Help!

(*Id.*)[5]

### E.      Continued Difficulties with Alice

The next incident related to Evanson's accommodations occurred on June 14, 2011, when Dawn King wrote Evanson an email.  (Evanson Decl., Ex. N at 27.)  In the email King referenced a hotline call that Evanson had received several days earlier.  (*Id.*)

---

[5] In February 2010 Evanson requested an accommodation regarding her scheduled work hours.  Evanson directed her physician to send a letter to Safe Haven indicating that Evanson "suffers from fatigue which is markedly worse in the evening hours.  It would be preferable for her to continue to work early daytime hours in order to maintain her physical energy and productivity." (Utech Aff., Ex. F.)  Evanson does not dispute that in response to this letter Safe Haven altered her work schedule by allowing Evanson to work day time shifts extending from early morning to early afternoon.  (*Id.* ¶ 13.)  In the three years between receipt of the physician letter and Evanson's resignation she worked past 4:00 p.m. on only six occasions, but never past 5:00 p.m.  (*Id.* ¶ 13, Ex. G.)  Evanson's physician sent an identical letter to Safe Haven in September 2010.  (Evanson Decl., Ex. F at 18.)  Evanson's claims for failure to accommodate do not stem from the requests for a work schedule change, although she does allege that Safe Haven retaliated against her for making this request.

When King had asked Evanson if she had information regarding the call that King could enter into Alice, Evanson indicated that she did not, and had not written down anything about the call.  (*Id.*)  When Evanson then began filling in a hotline call form she stated "I wish I would have known[n] that I was going to have to write this down."  (*Id.*)  King concluded:

> I have attached the email that was sent to you in April which clearly states that the protocol here at the shelter is that every hotline call must be documented and entered into Alice.  Because you can not use the Alice computer program and we wish to accommodate your inability to do so, the procedure that was outlined for you was that you would document the call and then turn the form in to me so that I can enter that information in to Alice on your behalf.  I would like to use this opportunity to reiterate that we are to document every single hotline call that we receive.  It is essential to the organization that we have this information so that staff here at the shelter and at the Family Justice Center can access information regarding our shelter residents and clients in the community
>
> If you have any further questions, or feel that you need to be accommodated in some other way, please let me know.

(*Id.*)

On August 1, 2011, several supervisors met with Evanson.  Safe Haven contends that the meeting was held to "discuss possible solutions to her need for accommodation." (Utech Aff., Ex. E at 8; *see also id.* ¶ 11.)  The supervisors claim that they told Evanson they were concerned that she was unable to identify a call as a crisis call and was not filling out a hotline call form and giving it to a supervisor "which was the accommodation we had made for her in the past so that she would not have to input the call into our computer system."  (*Id.*, Ex. E at 8.)  Evanson then indicated that "she didn't have a problem with writing the calls down but that she was simply forgetting to do so." (*Id.*)  The supervisors also discussed Evanson failing to document communications with

residents of Safe Haven.  (*Id.*)  Evanson indicated that she could not remember to document these communications.  (*Id.*)  The supervisors indicated that "[w]e said that maybe we could brainstorm some ideas as to how we could help her remember, and she again stated that she just forgets."  (*Id.*)  The supervisors indicated that at some point in the meeting Evanson "stood up and stated, 'I just don't remember, and I'm not going to be able to'.  She then opened the door and left the room."  (*Id.*)[6]

Utech wrote a letter to Evanson regarding the August 1 meeting in which she explained

> As you know your short term memory loss has made it difficult for you to perform the requirements of this job and we have made reasonable accommodations, such as allowing you to complete hotline call[s] on written forms that others enter into the Alice database for you.
>
> However, recently it has become apparent that this accommodation is no longer working.  The meeting we had on August 1, 2011 was to work with you to determine other accommodations which would allow you to continue to perform requirements of the job.  Not only . . . is it important that you be able to answer phone calls and relay the information you discuss to others in the organization but you must also be able to identify residents and ways you have worked with them.  We were discussing accommodations that could be made when you abruptly left the meeting. You appeared angry and hostile and before you left the meeting you indicated that you did not wish to work on accommodations, thereafter delivering another medical note stating that you can not return to work. . . . Considering your medical notes state that your condition is irreversible, it would appear that it would not be possible for you to meet the requirements of your position without accommodations.
>
> . . . .

---

[6] The Court recounts the facts regarding the August 1 meeting here as portrayed by Safe Haven, as Evanson does not dispute many aspects of the meeting.  Although Evanson disputes the purpose of the meeting, her contentions are explored more fully below.  To the extent the parties' description of the meeting conflicts, the Court will consider the evidence in the light most favorable to Evanson in resolving this motion.

> Should you choose not to work with us to find ways to meet the
> requirements of the position you may be able to seek long term disability
> under the policy Safe Haven carries through Principal Insurance.

(Evanson Decl., Ex. S at 33-34.)

Evanson testified that the August 1 meeting involved "a lot more" than discussing accommodations.  (Evanson Dep. 103:1-8.)   Specifically, Evanson testified that the meeting was actually about "things that they thought I could do and things they said I . . . wasn't doing, and – and it – it turned into not a discussion about accommodations.  It turned into a discussion on why I couldn't do this or why I couldn't do that." (*Id.* 103:9-13.)  Evanson testified that she felt the meeting was harassment because her supervisors wanted her "to explain my health conditions because they believed that I could do better than what I was doing." (*Id.* 104:14-20.)  Evanson testified that she did leave in the middle of the meeting because she was "in tears because I couldn't explain to them my medical condition," but disputed that she was "hostile" before she left the meeting. (*Id.* 103:13-18.)

Shortly after the August 1 meeting Evanson took medical leave.  (Evanson Decl., Ex. R at 32.)  When she spoke with a supervisor about having her paycheck mailed, Evanson told the supervisor that Evanson "really wanted to be [at work], but her dr. won't let her as they are worried about her.  She said that she didn't care who knew[,] that she was not mad at the girls, but couldn't be picked on anymore." (*Id.*)  Evanson then wrote to Utech explaining:

> I would like to return to work, but because I feel that I am being harassed
> that can't be possible at this time.

> As for the meeting on august 1st 2011, no way did I feel you, Janet, [and] Dawn were trying to accommodate me in any way, it was a meeting to tell me everything that I was doing wrong. I did not leave that meeting angry or hostile. I was crying and upset because I was once again being belittled and told of my many, (in your eyes) short comings.
>
> I want to return to my job and be able to do my work and not be harassed.

(*Id.*, Ex. T at 35.)

In a letter to Safe Haven dated September 20, 2011, a nurse treating Evanson explained that Evanson had been released to return to work as of October 2, 2011, and that "[a]ccommodations should be made so that Karen does not do data entry on the computer." (*Id.*, Ex. U at 36.)

On June 20, 2012, Evanson wrote an email to Utech which discussed some of her accommodations and the reaction of her coworkers to those accommodations. (*Id.*, Ex. Z at 41.) Evanson explained:

> As you know there are some work activities that I can not do or have trouble doing. Such as putting things in . . . alice, getting in alice to find information, using the fax machine, using the copy machine and looking up just about anything on the computer. When I do ask my co-workers to help me with these things I can tell that I am irritating them because of their increased work load. Can you please give me some advice on how to handle this and maintain good co-worker relations.

(*Id.*)

### F.    January 2013 Events

In early January 2013, Evanson had a meeting with supervisor Brittany Robb. (*Id.*, Ex. X at 39.) Robb sent an email to Utech describing the meeting, during which Evanson and Robb discussed "the importance of supporting each staff member even though we may not always agree." (*Id.*) They also discussed Evanson's recent hospital

stay and Robb "encouraged her to talk with me if she was feeling overwhelmed during her shifts." (*Id.*)   Robb also noted that Evanson said she loved her job "although the agency has taken her through hell and back." (*Id.*)   Evanson testified that she felt harassed by this email because she was unaware that the contents of this meeting would be communicated to Utech. (Evanson Dep. 83:16-25.)   Evanson also testified that she does not remember telling Robb that the agency had "taken her through hell and back," and thought that comment constituted harassment. (*Id.* 84:2-10.)   Evanson testified that she did not see this email until she received her personnel file after her resignation. (Evanson Decl. ¶ 26.)

In January Evanson also received a performance evaluation without being asked to complete a self-evaluation.   (*Id.* ¶ 32.)   The January evaluation is unsigned, and the record does not reflect by whom the evaluation was completed.   (*Id.*, Ex. BB at 43-48.) The evaluation gives Evanson "improvement needed" or "unsatisfactory" marks in each category.   (*Id.*)   With respect to quality of her work the evaluation noted that "[h]otline call forms need improvement – either very little information is captured, or none at all." (*Id.*, Ex. BB at 43.)   The evaluation also noted that Evanson "[i]s not accepting of certain procedures, or change in procedure" that occurred at the shelter, "[o]ften makes inappropriate, rude and/or disparaging comments about her co-workers and supervisors," "[c]reates an uncomfortable environment for co-workers and residents at times when she is upset," "[s]truggles with interpersonal relationships and professional conduct policies," and "focuses primarily on what she cannot do, or that she is unwilling to do rather than seek out tasks/activities that she is capable of."   (*Id.*, Ex. BB at 44-45, 47-48.)   Evanson

disagrees with the accuracy of most of the criticism contained in the evaluation. (*Id.* ¶ 32.)

On January 11, 2013, Evanson had a meeting with a Safe Haven supervisor. (*Id.*, Ex. CC at 49.) The meeting was held to discuss the January evaluation. (*Id.*) During the meeting the supervisor asked if there were any actions Safe Haven could take to improve Evanson's ability to be successful at her job. (*Id.*, Ex. CC at 49-50.) Evanson replied that there was nothing Safe Haven could do. (*Id.*, Ex. CC at 50.)

Evanson left work following the supervisor meeting and resigned several days later because she "was unable to continue working at Safe Haven Shelter because of the extremely hostile work environment and the impact it had on both [her] emotional and physical health." (*Id.* ¶ 2, Ex. CC at 50.) In a letter dated January 15, 2013, Evanson tendered her resignation to Safe Haven. (Utech Aff., Ex. A.) In the letter, Evanson explained that "I find I am forced to leave Safe Haven for a number of reasons, primarily because of the extreme stress from which I continue to suffer at Safe Haven." (*Id.*) In the letter Evanson took issue with the accuracy of her January 2013 performance review noting that "I believe this review was unfair, unfounded, and constituted just another example of what I feel is ongoing harassment and retaliation against me by Safe Haven management." (*Id.*) Evanson then responded to the various aspects of her performance review. (*Id.*, Ex. A at 1-2.)

### G.   Disciplinary Actions

Evanson was the subject of disciplinary action three times during the course of her employment. On April 8, 2011, Evanson left work for a medical appointment and

indicated that she would return to work following the appointment.  (Utech Aff. ¶ 16.)

When she left, Evanson signed out of work on the wrong form.  (Evanson Decl., Ex. G at

19.)  Evanson does not dispute that she did not return to work and did not inform a

supervisor that she would not be returning, but contends that this failure was due to a

miscommunication with her daughter.  (*Id.*, Ex. L at 24.)  Safe Haven initially issued a

written warning which was later reduced to a verbal warning.  (*Id.*, Ex. G at 19; *id.*, Ex. L

at 24; Utech Aff. ¶ 16.)  In a letter written to Evanson, Safe Haven indicated "[i]n the

future, please call a supervisor when you will not be able to complete a scheduled shift."

(Evanson Decl., Ex. G at 19.)

On May 8, 2011, Evanson left work for a medical appointment and without

contacting a supervisor did not return to work the next day.  (*Id.*, Ex. L at 24.)  Evanson's

medical provider attempted to send a fax to Safe Haven on May 9 indicating that

Evanson could not return to work until June 9, but the fax machine at Safe Haven was not

working.  (*Id.*; *see also id.*, Ex. I at 21.)  After Utech contacted Evanson on May 9 to

inquire why she was not at work, Evanson's daughter delivered a copy of the doctor's

letter to Safe Haven.  (*Id.*, Ex. L at 24.)  Although Safe Haven acknowledged that its fax

machine was broken, Utech indicated to Evanson that she was imposing a written

warning because

> [t]he question is whether or not it was appropriate for you to contact a
> supervisor about your requested sick leave of a month's duration or
> whether it was appropriate to rely solely on a letter written by your doctor
> and technology to get that letter there and that tacit approval instead of
> stated approval was enough.  Looking at the totality of the circumstances,
> especially following the 4/18/11 warning . . . which states "[i]n the future,
> please call a supervisor when you will not be able to complete a scheduled
> shift[.]"  I believe you should have contacted your supervisor directly about

> this leave.  Therefore, I am imposing a **written warning** as a result of this
> incident.

(*Id.* (emphasis in original); *see also* Utech Aff. ¶ 16.)  There was another incident around the same time where an intern reported that Evanson had tried to get the intern to look up garage sales on the internet for her.  Because the intern was no longer working at Safe Haven, Utech took Evanson "at [her] word that there was a misunderstanding regarding this matter" and declined to impose any disciplinary action.  (Evanson Decl., Ex. L at 24-25.)

Another incident occurred in May 2011 which also resulted in discipline.  (*Id.*, Ex. L at 25.)  Safe Haven requested that employees submit insurance information in order to allow Safe Haven to obtain quotes from health insurance companies.  (*Id.*; Utech Aff. ¶ 16.)  Evanson refused to complete the questionnaire and therefore prevented Safe Haven from obtaining competitive quotes for a group health plan.  (Utech Aff. ¶ 16.)  Utech sent Evanson a follow up letter explaining that the submissions would be confidential and not accessible to Safe Haven.  (Evanson Decl., Ex. J at 22.)  Utech also explained that "[f]ailure to comply with this request will result in discipline."  (*Id.*)  Evanson still did not complete the questionnaire and received a one-day suspension for her insubordination.  (*Id.*, Ex. L at 25.)  Each of the three employees that refused to complete the questionnaire were disciplined.  (Utech Aff. ¶ 16.)

An incident on December 29, 2011, did not result in discipline, but did result in a reprimand.  (Evanson Decl., Ex. W at 38; *id.*, Ex. Y at 40.)  This reprimand was related to allegations that Evanson had "failed to respond to a client's needs," had "not been an active team participant with respect to Jovi," and that she "vilified and intimidated other

employees." (*Id.*, Ex. W at 38.)  Evanson's response to these accusations was that she did not recall the incidents or that they did not occur.  (*Id.*)

## II.   PROCEDURAL HISTORY

On June 10, 2011, Evanson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging, among other things, discrimination and retaliation under the ADA.  (Utech Aff., Ex. K at 35.)  Evanson filed an amended charge on June 28, 2011.  (*Id.*, Ex. K at 37.) Evanson also filed a charge of discrimination and an amended charge with the Minnesota Department of Human Rights. (*Id.*, Ex. K at 35, 38.)

On May 17, 2012, Evanson filed a complaint alleging violations of the ADA, MHRA, and Genetic Information Nondiscrimination Act of 2008.[7]  (Compl. ¶¶ 22-43, May 17, 2012, Docket No. 1.)  Specifically, Evanson alleges that Safe Haven failed to accommodate her "disabling condition," retaliated against her as a "direct result of her disabilities," and "created and perpetuated a hostile work environment for Plaintiff as a direct result of Plaintiff's need and request for accommodations for her disabilities." (Compl. ¶¶ 17-19, 29-31.)

Safe Haven moves for summary judgment on all of Evanson's claims.  (Mot. for Summ. J., Apr. 5, 2013, Docket No. 12.)  The Magistrate Judge held a hearing on the motion.  (Minute Entry, July 2, 2013, Docket No. 29.)  Because Evanson had submitted a

---

[7] At the hearing before the Magistrate Judge on Safe Haven's motion for summary judgment, Evanson moved to voluntarily dismiss her claims under the Genetic Information Nondiscrimination Act.  She does not object to the Magistrate Judge's recommendation that these claims therefore be dismissed with prejudice.  (R&R at 1 n.1.)

declaration containing copies of her and Utech's depositions on June 27 – almost two months after her response to the motion for summary judgment was due – the Magistrate Judge allowed her to file a supplemental letter brief following the hearing "setting forth her arguments as to the factual basis in either of those depositions which she believed defeated Defendant's motion for summary judgment." (R&R at 14, Oct. 2, 2013, Docket No. 32.)   Evanson did file such a brief.   (Letter to Magistrate Judge, July 10, 2013, Docket No. 30.)   On October 2, 2013, the Magistrate Judge issued an R&R recommending that Safe Haven's motion be granted in full because some of Evanson's claims were time-barred and, with respect to others, she had failed to present evidence creating a genuine issue of material fact as to whether Safe Haven failed to accommodate her or retaliated against her in violation of the ADA and the MHRA.   (R&R at 18-40.) Evanson filed timely objections to the R&R.   (*See* Pl.'s Objections to R&R ("Objections"), Oct. 16, 2013, Docket No. 33.)

## ANALYSIS

### I.   STANDARD OF REVIEW

Upon the filing of a report and recommendation by a magistrate judge, a party may "serve and file specific written objections to the proposed findings and recommendations."   Fed. R. Civ. P. 72(b)(2); *accord* D. Minn. LR 72.2(b).   "The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to."   Fed. R. Civ. P. 72(b)(3).

Here, the Magistrate Judge issued a recommendation applying Federal Rule of Civil Procedure 56.   Summary judgment is appropriate where there are no genuine issues

of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

## II.     FAILURE TO ACCOMMODATE

Under the ADA an employer must provide "reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability who is an . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]."  42 U.S.C. § 12112(b)(5)(A).  An employer's failure to make a reasonable accommodation is prohibited discrimination under both the ADA, *Peebles v. Potter*, 354 F.3d 761, 765 (8th

Cir. 2004), and the MHRA, Minn. Stat. § 363A.10, subd. 1. The Court analyzes an employer's liability under both the ADA and the MHRA using the same legal standards. *See Fenny v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 711 n.5 (8th Cir. 2003).

To prevail on a claim for failure to accommodate, the plaintiff must show that (1) she is a qualified individual with a disability under the relevant statutes, (2) the disability and its consequential limitations were known to her employer, and (3) "the employer failed to make 'reasonable accommodations' for such known limitations." *Feist v. La., Dep't of Justice, Office of Attorney Gen.*, 730 F.3d 450, 452 (5th Cir. 2013); *see also Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013); *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1176 (7th Cir. 2013); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *Lyons v. Legal Aid Soc'y*, 68 F.3d 1512, 1515 (2d Cir. 1995).[8]

---

[8] The Eighth Circuit has typically stated the elements of a failure to accommodate claim in the context of a modified burden shifting framework. *See, e.g.*, *Fenny*, 327 F.3d at 712-13. In *Brannon v. Luco Mop Co.*, 521 F.3d 843 (8th Cir. 2008), the Eighth Circuit explained this modified burden shifting approach as first requiring the plaintiff to establish a prima facie case that he (1) has an ADA disability, (2) suffered an adverse employment action, and (3) is a qualified individual within the meaning of the ADA – meaning that he possesses the requisite skills and training to be able to perform the essential job functions with or without reasonable accommodation. *Id.* at 848. If the employee claims that he can perform the job functions with a reasonable accommodation he must make a "facial showing that a reasonable accommodation is possible." *Id.* (internal quotation marks omitted). "[T]he burden then shifts to the employer to show that it is unable to accommodate the employee." *Id.* (internal quotation marks omitted). Because this test does not clearly establish a place for considerations of whether an employee has made a request for a reasonable accommodation or whether employers actually offered or attempted to offer a reasonable accommodation, district courts in this Circuit have attempted to insert these questions into the burden-shifting framework, but have done so in inconsistent ways and without always explicitly acknowledging at what step of the analysis those inquiries become relevant. *See, e.g.*, *Hill v. Walker*, 918 F. Supp. 2d 819, 831 (E.D. Ark. 2013) (finding that whether an employer engaged in a good faith interactive process concerning potential accommodations was a consideration separate from the burden-shifting framework, but that

(Footnote continued on next page.)

_____

(Footnote continued.)

evidence of failure to engage would preclude the grant of summary judgment on the failure to accommodate claim); *Donnelly v. St. John's Mercy Med. Ctr.*, 635 F. Supp. 2d 970, 996-97 (E.D. Mo. 2009) (reciting the burden-shifting framework then explaining that "even if plaintiff could establish that she suffered an adverse employment action, St. John's met its duty to engage in the interactive process with plaintiff in a good faith effort to accommodate her disability" and finding that for that reason "St. John's is entitled to summary judgment"); *Beveridge v. Nw. Airlines, Inc.*, 259 F. Supp. 2d 838, 851 (D. Minn. 2003) (finding that an employee's request for an accommodation was "[a] predicate" to bringing a claim for failure to accommodate and should be addressed prior to engaging in the burden-shifting analysis).

The Court finds that the burden shifting construction of the proof required to establish a failure to accommodate claim is a poor fit where, as here, the employer argues both that the employee failed to request an accommodation and that the employer actually provided the employee with a reasonable accommodation. In this case, assuming that Evanson could satisfy her burden of proof under the burden shifting framework, it would make little sense to shift the burden to Safe Haven to show that it was "unable to accommodate" Evanson, when Safe Haven's contention has always been that it **did** accommodate her. The Court therefore relies upon the elements of a failure to accommodate claim recited by the Fifth Circuit in *Feist* and used by the majority of other circuits in resolving similar disputes, because the analytical framework of those elements is more applicable to the context of the specific claims and arguments in this case than a burden-shifting test.

The Court notes that, although constructed differently, both the Eighth Circuit's burden shifting test and the elements defined by *Feist* ultimately serve to answer the same fundamental question – has the plaintiff identified sufficient information such that a jury could reasonably conclude that her employer failed to reasonably accommodate her disability. Additionally, although *Feist* does not require the plaintiff to establish a separate adverse employment action as part of her prima facie case like the Eighth Circuit's burden shifting test, the Eighth Circuit itself has not always required such a showing. *See Peebles*, 354 F.3d at 767 ("In a reasonable accommodation case, the 'discrimination' is framed in terms of the failure to fulfill an affirmative duty – the failure to reasonably accommodate the disabled individual's limitations."). Finally, the Eighth Circuit has sometimes used elements of failure to accommodate claims that are almost identical to the elements identified in *Feist*, suggesting that a burden shifting framework is not the sole method of proving a failure to accommodate claim in the Eighth Circuit. *See Liljedahl v. Ryder Student Transp. Servs., Inc.*, 341 F.3d 836, 842 (8th Cir. 2003) ("[T]o maintain a failure to accommodate claim, [plaintiff] must show [defendant] knew of her disability and failed to make reasonable accommodation for the known limitations."); *cf. Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076 (8th Cir. 2006) (requiring a plaintiff alleging a failure to accommodate claim under a similar statute to show "(1) that the plaintiff is disabled and otherwise qualified academically, (2) that the defendant is a [covered actor under the statute], and (3) that the defendant failed to make reasonable modifications that would accommodate the plaintiff's disability without fundamentally altering the nature of the public accommodation" (internal quotation marks omitted)).

The Magistrate Judge concluded that Safe Haven was entitled to summary judgment on Evanson's failure to accommodate claims because Evanson failed to present evidence that she made a request for accommodation after June 7, 2010, as required by the applicable statute of limitations.  (R&R at 18-19, 30-38.)  Evanson does not object to the Magistrate Judge's determination that her failure to accommodate claim can be based only upon conduct that occurred after June 7, 2010, but objects to the conclusion that she made no requests for a reasonable accommodation after that date.  (Objections at 7-8.)

Evanson's objections go to the second element of a reasonable accommodation claim – whether her disability and its consequential limitations were known to her employer.  This element requires a plaintiff to "request an accommodation before liability under the ADA attaches."  *See Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 608 (7th Cir. 2012) (internal quotation marks omitted); *Kobus v. College of St. Scholastica, Inc.*, 608 F.3d 1034, 1038 (8th Cir. 2010) ("To establish a claim of disability discrimination under the ADA, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." (internal quotation marks omitted)); *see also* 42 U.S.C. § 12112(b)(5)(A) (providing that the reasonable accommodation requirement applies only to "known" disabilities).  Although "the absence of an express and unequivocal request is not necessarily fatal to a failure-to-accommodate claim" the employee's request "nonetheless must make clear that the employee wants assistance for his or her disability.  In other words, the employer must know of both the disability and the employee's desire for accommodations for that disability."  *Ballard v. Rubin*, 284 F.3d 957, 961-62 (8th Cir. 2002) (internal quotation marks omitted).

Here, Evanson identifies three communications which she contends show that she made requests for accommodations after June 2010: (1) the August 2011 letter from Utech to Evanson in which Utech stated "The meeting we had on August 1, 2011 was to work with you to determine other accommodations which would allow you to continue to perform the requirements of the job." (Evanson Decl., Ex. S at 33-34); (2) the June 20, 2012 email from Evanson to Utech in which Evanson referenced her difficulties using computers and asked for help maintaining relationships with her coworkers;[9] and (3) the September 20, 2011 letter from Evanson's nurse stating that "accommodations should be made so that Karen does not do data entry on the computer." (Evanson Decl., Ex U at 36.)   The Court finds that a reasonable jury could likely conclude that, of these communications, at least the September 2011 letter from Evanson's nurse constituted a request for an accommodation.[10]   Although the letter is not particularly specific regarding Evanson's disability or the type of accommodation needed and seems repetitive of accommodations already in place, a reasonable jury could conclude that it was sufficient to indicate to Safe Haven that Evanson had some work limitations as a result of her

---

[9] In her objections Evanson contends that the Magistrate Judge "did not reference" the June 2012 email.  (Objections at 7.)  That is incorrect.  The Magistrate Judge devoted a 19-line discussion to that exact email.  (R&R at 36-37.)

[10] Although the August 2011 letter from Utech references accommodations, it does not support a finding that Evanson herself requested certain accommodations in August 2011. Instead, the letter explains that Safe Haven was noticing other non-data entry related problems with Evanson's work product and was interested in making accommodations to the extent any of these problems were related to her short term memory issues.  Additionally, the Court finds that the Magistrate Judge correctly concluded that the June 2012 email was not a request for accommodations related to a disability but rather it "simply request[ed] general advice for how to deal with her inter-office relationships with her co-workers."  (R&R at 36.)

disability.  *See Ekstrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 976 (7th Cir. 2009)

("[O]ur cases have consistently held that disabled employees must make their employers

aware of any nonobvious, medically necessary accommodations with corroborating

evidence such as a doctor's note or at least orally relaying a statement from a doctor

. . . .").

Even if the September 2011 letter was sufficient to request an accommodation,

however, Evanson has presented no evidence that would allow a reasonable jury to

conclude that Safe Haven failed to make "'reasonable accommodations' for such known

limitations." *Feist*, 730 F.3d at 452.  In determining whether reasonable accommodations

are available, an employer is required to engage in an interactive process to determine an

appropriate accommodation.  *Knutson v. Schwan's Home Serv., Inc.*, 711 F.3d 911, 915

(8th Cir. 2013).  "The interactive process is informal and flexible, enabling both employer

and employee to identify the employee's limitations and accommodations." *Kratzer v.

Rockwell Collins, Inc.*, 398 F.3d 1040, 1045 (8th Cir. 2005).  During the interactive

process, an employer is obligated to reasonably accommodate an employee's request for

an accommodation, but is not required to provide the exact accommodation requested.

*See Bublotz v. Residential Advantages, Inc.*, 523 F.3d 864, 870 (8th Cir. 2008), *abrogated

on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011).  To

demonstrate that an employer failed to arrive at a reasonable accommodation by failing to

engage in the interactive process, an employee must show that after she made a request

for an accommodation, the employer did not make a good faith effort to assist her in

making accommodations, and that the employer could have reasonably accommodated

her, but for its lack of good faith.  *See Cravens v. Blue Cross & Blue Shield of Kan. City*,

214 F.3d 1011, 1021 (8th Cir. 2000); *see also Ballard*, 284 F.3d at 960.  Additionally,

> [b]oth parties, not just the employer, have an obligation to participate in the interactive process, and where the plaintiff fails to fulfill her responsibility in the interactive process, for example, by failing to provide information necessary for her employer to fashion an appropriate accommodation, the plaintiff's failure to do so may bar her accommodation claim.

*Magnussen v. Casey's Mktg. Co.*, 787 F. Supp. 2d 929, 956 (N.D. Iowa 2011) (citing

*Kratzer*, 398 F.3d at 1045; *EEOC v. Convergys Customer Mgmt. Grp., Inc.*, 491 F.3d

790, 796 (8th Cir. 2007)).

Evanson does not dispute that after raising the issue of her disability, she was

provided with an accommodation that prevented her from having to enter data into Alice.

Rather than requiring her to enter data into Alice, Safe Haven permitted her to handwrite

the relevant forms and provide them to other Safe Haven employees or her supervisors to

enter into Alice.  Evanson testified that this accommodation allowed her to continue in

her position as an advocate by eliminating from her responsibilities the tasks she had

reported that she could not complete due to short term memory loss.

In her memorandum in opposition to the present motion, Evanson's sole argument

that the accommodation was not reasonable was because the accommodation caused

"coworkers to feel unduly burdened by the extra work assignments and to take that

frustration out on the protected worker.  It is not an uncommon phenomenon for that

frustration to become viral and turn a workplace into a hotbed of hostility and drama."

(Pl.'s Mem. in Opp. to Mot. for Summ. J. at 14-15, Apr. 26, 2013, Docket No. 22; *see*

*also* Letter to Magistrate Judge at 1.)  Even if coworker resentment was a proper basis for

demonstrating the unreasonableness of an accommodation, Evanson testified that when she brought this concern to the attention of her supervisors, they instructed her to provide her handwritten forms to her supervisors instead.  Evanson testified that this modification alleviated her concerns about coworkers performing her jobs.  That Evanson sometimes failed to provide her handwritten forms to supervisors and instead gave them to coworkers does not provide evidence upon which a jury could find that Safe Haven failed to provide her with reasonable accommodations.

In her objections, Evanson suggests for the first time that the accommodation was inadequate "as proven by Defendant's repeated criticisms of Plaintiff with respect to her data entry up until her resignation."   (Objections at 1.)   But the criticisms Evanson references[11] did not relate to the accommodations she requested – that she not be required to enter data into Alice because of difficulties associated with her short term memory loss.  The June 2011 email from King stating that Evanson had failed to document a hotline call was not a criticism that the accommodation of Evanson handwriting notes and providing them to her supervisors was inadequate or was failing to provide Evanson with the ability to do her job in the absence of computer data entry.  Rather, it was a criticism that Evanson was failing to follow that reasonable accommodation and had not provided King with any information about the call.  In the August 1, 2011 meeting, supervisors similarly expressed concern that Evanson was simply failing to write down

---

[11]   Evanson does not actually reference any specific criticisms or cite to the portions of the record that might support her contention.  The Court lists here the only possible relevant criticisms that it has gleaned from the record.

phone calls that came in and was unable to identify which phone calls were crisis calls requiring documentation.  Neither was the August 2011 email from Utech an indictment of the reasonable accommodation that Evanson handwrite notes to be entered into Alice by her supervisor.  The email explains that Safe Haven was interested in developing "**other** accommodations" to allow Evanson to perform the requirements of her job such as "be[ing] able to identify residents and the ways you have worked with them." (Evanson Decl., Ex. S at 34 (emphasis added).)  That Evanson struggled with other aspects of her job does not indicate that the accommodation to prevent her from entering data into a computer was inadequate.

Finally, even if a reasonable jury were to conclude that the accommodation of handwriting notes was unreasonable or inadequate, the jury could conclude only that the failure to arrive at a more adequate accommodation was due to Evanson's refusal to engage in the interactive process.  Evanson does not dispute that Safe Haven held meetings to discuss her job performance and abilities in light of her disability.  Nor does Evanson dispute that she left these meetings abruptly without offering a single suggestion as to a reasonable accommodation that would be more effective or information about her disability and her related limitations.  Rather, Evanson contends that these meetings upset her because Safe Haven sought to discuss tasks that Evanson could and could not complete and asked her "to explain [her] health conditions" and therefore were not meetings designed to discuss reasonable accommodations.  (Evanson Dep. 104:14-20.) But the information sought by Safe Haven in these meetings is precisely the type of information an employer needs to determine appropriate accommodations.  *See*

*Convergys Customer Mgmt. Grp., Inc.*, 491 F.3d at 796 (finding that the employee had adequately participated in the interactive process because "there is no dispute that [plaintiff] provided [defendant] with all of the information relevant to his disability and the disability's [e]ffect on his job performance").  Evanson testified that she left these meetings "in tears because I couldn't explain to them my medical condition."  (Evanson Dep. 103:13-18.)   Evanson does not dispute that she never provided the requested information regarding the extent of her disability and the tasks she was able to perform in the meetings, via letter or email, or in any other format to Safe Haven.  Therefore, it is undisputed that Evanson failed to engage in the interactive process by providing Safe Haven with necessary information about her disability and related limitations to allow them to more appropriately tailor an accommodation.  *See Kratzer*, 398 F.3d at 1045 (finding that employer could not provide an appropriate accommodation where the employee did not follow up by obtaining an updated physical evaluation); *see also Jackson v. City of Chicago*, 414 F.3d 806, 813-14 (7th Cir. 2005) (finding that plaintiff's failure to respond to the employer's specific requests for information asking for a description of the extent of her limitations was the cause of a breakdown in the interactive process).

Furthermore, at no time during her employment or even in the course of this litigation has Evanson ever once suggested what Safe Haven should or could have done to accommodate Evanson's disability in a more effective manner than allowing her to handwrite forms rather than entering data into Alice.  *See Magnussen*, 787 F. Supp. 2d at 958 (finding that the employee was responsible for the breakdown of the interactive

process as a matter of law where she "admits that, prior to her termination, she did not propose, request, or accept any accommodation of her restrictions other than [defendant]'s paying an extra person to work in addition to her to perform the functions of her position that she was unable to perform"). Because Evanson has failed to present evidence upon which a reasonable jury could conclude that Safe Haven failed to reasonably accommodate her disability in violation of the ADA, the Court will grant Safe Haven's motion for summary judgment with respect to this claim.

## III.   RETALIATION

The ADA and the MHRA prohibit employer discrimination against any employee due to the employee's complaints about discrimination.  42 U.S.C. § 12203(a); Minn. Stat. § 363A.15.  In the absence of direct evidence of retaliation, these claims are analyzed under the *McDonnell Douglas* burden shifting framework.  *See Gilbert v. Des Moines Area Community College*, 495 F.3d 906, 917 (8th Cir. 2007).  The plaintiff must first establish a prima facie case of retaliation by showing that (1) he engaged in statutorily protected conduct, (2) he suffered an adverse employment action, and (3) there is a causal connection between the two.  *Heisler v. Metro. Council*, 339 F.3d 622, 632 (8th Cir. 2003).

Here, the Magistrate Judge found that Evanson could not establish a prima facie case of retaliation because she did not suffer a materially adverse employment action. (R&R at 24-28.)  Specifically, the Magistrate Judge noted that Evanson had failed "to articulate any specific adverse action taken against her" in opposition to the motion for summary judgment.  (*Id.* at 25.)  Additionally, the Magistrate Judge found that at most

the record showed that any negative actions taken by Safe Haven were "scattered, petty and without any causal link to retaliation." (*Id.* at 26.)   Evanson objects to this conclusion.   In her memorandum in opposition to the motion for summary judgment the only discussion of adverse employment action was Evanson's assertion that "[h]ere, the cumulative effect of Defendant's retaliatory conduct over the course of several years and to the varying degrees of hostility and reasonableness should be considered sufficiently adverse to survive a motion to dismiss."  (Pl.'s Mem. in Opp. to Mot. for Summ. J. at 12.) In her objections, again without citation to the record, Evanson indicates that she suffered five adverse employment actions in retaliation for making requests for reasonable accommodations:

1. The hostile work environment perpetuated by Defendant against Plaintiff;
2. The multiple and groundless disciplinary actions Defendant instituted against Plaintiff;
3. The meaningless and harassing "meetings" between Plaintiff and multiple supervisors wherein the supervisors took turns telling Plaintiff all of the things she was doing wrong and belittling her;
4. Defendant's refusal to respond to Plaintiff's requests for assistance; and
5. An extremely negative and unprofessional "performance review" from a brand-new supervisor who concocted numerous undocumented and witnessed allegations that was never investigated or substantiated.

(Objections at 4.)

The Court concludes that even if these actions – taken individually or collectively – are sufficient to demonstrate an adverse employment action as required to establish a prima facie case of retaliation, Evanson has failed to demonstrate any causal connection between these actions and her protected conduct.  With respect to causation, Evanson

argues that "the more Defendant perpetuated the harassment of Ms. Evanson, the more work Ms. Evanson missed and the more accommodations she required.  Similarly, the more work Ms. Evanson missed, the more trouble she got into."  (Pl.'s Mem. in Opp. to Mot. for Summ. J. at 13.)   The problem with Evanson's argument is that her absence from work was not related to her request for reasonable accommodations – that she be allowed to handwrite rather then enter data into a computer – or her stated disability – that she had difficulty with her short-term memory.   Evanson has also not presented evidence that her frequent absences from work resulted in other disabilities that required further accommodation.   So, although Evanson suggests that her absence from work was related to certain disciplinary actions, she has not demonstrated that those disciplinary actions or her absences were related to her disability.  *See Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 865 (8th Cir. 2006) (finding that an employee must show that "retaliatory motive played a part in the adverse employment action").

To the extent Evanson relies on the timing of her protected conduct and the alleged retaliatory actions, her claim similarly fails.  Where a plaintiff relies solely upon a temporal connection to show causation, the protected conduct and the adverse employment action must occur close in time.  *See Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 633 (8th Cir. 2005); *see also Sisk v. Picture People, Inc.*, 669 F.3d 896, 901 (8th Cir. 2012) ("More than two months is too long to support a finding of causation without something more.").   Here, Evanson claims that she asked for a reasonable accommodation and raised the issue of her disability at least as early as September 2009. But Safe Haven did not take any disciplinary action against Evanson or hold any

meetings in which it criticized Evanson until 2011. Additionally, Evanson's negative performance review was completed in 2013. The period of time between Evanson's protected conduct and the allegedly retaliatory actions is too long to support an inference of a causal connection. *Cf. Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) ("Here, the interval of two months between the complaint and Ms. Kipp's termination so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in Ms. Kipp's favor on the matter of causal link.").

## IV.    HOSTILE WORK ENVIRONMENT

To establish a claim for hostile work environment a plaintiff must show that (1) he is a member of a protected group, (2) there was unwelcome harassment, (3) there was a causal nexus between the harassment and membership in the protected group, and (4) the harassment affected a term, condition, or privilege of employment. *Watson v. CEVA Logistics U.S., Inc.*, 619 F.3d 936, 942 (8th Cir. 2010); *see also Frieler v. Carlson Mktg. Grp., Inc.*, 751 N.W.2d 558, 571 n.11 (Minn. 2008). To establish that harassment altered a term, condition, or privilege of employment, a plaintiff must "show that it was 'severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive.'" *Diaz v. Swift-Eckrich, Inc.*, 318 F.3d 796, 800 (8th Cir. 2003) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 21 (1993)). This standard "is a demanding one, and '[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious)' will not suffice." *Watson*, 619 F.3d at 942 (alteration in original) (quoting *Arraleh v. Cnty. of Ramsey*, 461 F.3d

967, 979 (8th Cir. 2006)). Instead, the plaintiff must demonstrate that the workplace was "permeated with discriminatory intimidation, ridicule, and insult." *Id.* (internal quotation marks omitted). And the "'[m]ere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to support a claim of hostile work environment.'" *Id.* (alteration in original) (quoting *Arraleh*, 461 F.3d at 979). "The environment must be both objectively hostile to a reasonable person and subjectively hostile to the victim." *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005).

The Court assesses the existence of a hostile work environment "based on the totality of the circumstances." *O'Brien v. Dep't of Agric.*, 532 F.3d 805, 809 (8th Cir. 2008). Specifically, the Court examines "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Arraleh*, 461 F.3d at 979 (internal quotation marks omitted).

Here, the Magistrate Judge found that the record does not reflect an objectively hostile or abusive work environment. (R&R at 38-40.) In her objections, Evanson indicates that her hostile work environment claim is based on the same actions that she contends constituted adverse employment actions for purposes of her retaliation claim. At most, Evanson has demonstrated that she was subject to several instances of criticism and reprimands, as well as some generalized coworker resentment over the course of her five-year employment with Safe Haven. Evanson has not presented evidence that any allegedly discriminatory conduct was particularly frequent or **objectively** severe or

threatening.[12]   Therefore, the Court agrees that Evanson's allegations are insufficient to meet the demanding standard of demonstrating a hostile work environment.  *See Devin*, 491 F.3d at 788 ("As for her claims she was denied a Route Builder, was unfairly disciplined, was paid less than male RMs, was not allowed to expense pay phone calls, and was required to make inventory changes on the computer, they, at best, amount to a frustrating work environment rather than an objectively hostile work environment."); *see also Bradley v. Widnall*, 232 F.3d 626, 631-32 (8th Cir. 2000) (finding allegations that plaintiff's "supervisory duties were curtailed, that she was left out of the decision-making process, treated with disrespect, and subjected to false complaints . . . may have resulted in a frustrating work situation [but were not] so severe or pervasive as to have affected a term, condition, or privilege of her employment"), *abrogated on other grounds by Torgerson*, 643 F.3d 1031.  Because Evanson has failed to present evidence upon which a reasonable jury could find that she was subjected to a hostile work environment as a result of her disability, the Court will grant Safe Haven's motion for summary judgment on that claim.

---

[12] Indeed, other than general descriptions, Evanson has provided very little evidence of her work environment at all.  For example, Evanson argues that there were an unidentified number of "meaningless and harassing 'meetings' between Plaintiff and multiple supervisors wherein the supervisors took turns telling Plaintiff all of the things she was doing wrong and belittling her."  (Objections at 4.)  Evanson does not identify which meetings she refers to, how many occurred, and what the supervisors said to her – other than criticizing her job performance and asking her about her medical condition – that caused her to become upset.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, the Court **SUSTAINS in part** and **OVERRULES in part** Plaintiff's objections [Docket No. 33] as explained in this Order.  The Court **ADOPTS** the Magistrate Judge's Report, to the extent it is consistent with this Order, and Recommendation [Docket No. 32]. Accordingly, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 12] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: March 31, 2014                        _____
at Minneapolis, Minnesota.                                JOHN R. TUNHEIM
                                                    United States District Judge